[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 8, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-14962

_____

D. C. Docket No. 97-01742-CV-TWT-1

JOSE MAIZ, OZIEL GARZA, et al.,

Plaintiffs-Counter-
Defendants-Appellees,

versus

AMIR VIRANI, ATLANTA ASSOCIATES, INC., et al.,

Defendants-Counter-
Plaintiffs-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____
**(June 8, 2001)**

Before ANDERSON, Chief Judge, MARCUS and KRAVITCH, Circuit Judges.

MARCUS, Circuit Judge:

Defendants Amir Virani, Ignacio Santos, and three companies affiliated with them appeal the district court's entry of an $18 million judgment against them on Plaintiffs' civil RICO claim. Plaintiffs, who are Mexican citizens, allege that Defendants solicited their investment in a Georgia real estate venture, only to defraud them by taking hidden profits on land sales, claiming unauthorized expense reimbursements and commissions on real estate transactions, and using Plaintiffs' contributions to pay for the defense of this lawsuit. A jury returned a verdict in Plaintiffs' favor. On appeal, Defendants raise multiple objections, many but not all of which relate to damages. Notably, Defendants do not argue that there was insufficient evidence to support the liability verdict as a whole, although they do challenge the entitlement of certain Plaintiffs to recover on certain claims. After a thorough review of the record and the parties' arguments, we find no reversible error, and therefore affirm the judgment.

I.

We start by summarizing the key facts of this case and the evidence produced by the Plaintiffs upon which the jury based its verdict. Plaintiffs are 53 residents of Monterrey, Mexico; most of them are members of fourteen family groups. Also plaintiffs in this case (although not participants in this appeal) are six corporations to which the individual Plaintiffs eventually transferred their

2

interests.[1]  Defendants include several individuals -- Amir Virani, Ignacio Santos, Rodrigo Gonzalez, and Rodrigo Padilla -- and several companies -- Atlanta Associates, Inc. ("AA"), Signa Development Corp. ("Signa"), Sanvir Development, Inc. ("Sanvir"), Savoy Properties, Inc. ("Savoy"), and Sanig Investments, Ltd. ("Sanig").  Virani and Santos control AA, Signa, and Sanvir.[2]

This lawsuit arises out of Plaintiffs' participation in transactions orchestrated by Virani and Santos for the ostensible purpose of acquiring, developing, and then re-selling real estate near Atlanta, Georgia.  By the late 1980s, AA and Signa began acquiring and assembling six tracts of undeveloped real estate in Georgia.  In 1988 and 1989, Plaintiffs become investor-partners in six new Georgia general partnerships meant to develop the tracts.  Precisely how Plaintiffs came to be investors was a subject of dispute at trial.  Plaintiffs contend that Santos and Virani hired a Monterrey brokerage firm, Abaco Casa de Bolsa ("Abaco"), to assist Defendants in soliciting Mexican partners to invest in the partnerships.  There is no dispute that Virani and Santos agreed to pay Abaco a commission equal to five

---

[1]Unless otherwise noted, when we speak of "Plaintiffs" in this opinion, we refer only to the individual Plaintiffs.

[2]The district court granted summary judgment in Defendants' favor as to all claims against Gonzalez, Padilla, Savoy, and Sanig; hence, those parties are not participants in this appeal.  The propriety of this summary judgment ruling is the subject of a separate appeal by the Plaintiffs, and we offer no view today on that ruling.

percent of the amount raised from investors, plus an additional 20 percent of the net profits when the partnerships eventually sold the properties. Plaintiffs also allege that Abaco brokers told them that Abaco was representing Santos and Virani.[3]

In soliciting the Plaintiffs, Abaco presented a brochure describing each partnership. The brochures were prepared by Virani and Santos for distribution by Abaco. Each brochure represented that Defendants would receive no compensation until the investor-partners recovered their investments plus the equivalent of twelve percent interest per year. Various Plaintiffs were brought to Georgia to view the properties and to receive a sales pitch from Virani or Santos; Virani and Santos also met with prospective partners in Monterrey. Among the promises allegedly made in the brochures and marketing meetings, besides the promise of no "up-front" compensation, were that Santos and Virani would be investing their own cash and would be partners in the partnerships, and that the

---

[3]Defendants argued to the jury, and assert summarily on appeal, that throughout the scheme Abaco was acting solely as an agent for the Plaintiffs, not the Defendants. Plaintiffs, however, introduced substantial evidence that Abaco served as Defendants' agent in soliciting them to invest funds in the partnerships, and also served as a conduit for information from the Defendants regarding the venture. The district court instructed the jury regarding the parties' differing views of Abaco's role, and set forth the relevant law governing principal-agent relationships. The jury necessarily accepted Plaintiffs' version of the relationship between Defendants and Abaco, and Defendants completely fail to establish that, as a matter of law, Abaco could not be deemed their agent. Indeed, Defendants never marshal the evidence and authority that they apparently believe compel a contrary conclusion.

properties being assembled were to be acquired for the partnerships in arms-length transactions involving unrelated third parties.

The six partnerships were ultimately formed in 1989. Partnership interests were awarded based on the partners' individual capital contributions. The six Partnership Agreements, which are virtually identical, named Sanvir as managing partner; Sanvir was also awarded a 1% interest in each partnership. Sanvir, Sanig, and Savoy -- all controlled by Virani and Santos -- eventually owned 10-20% of each partnership; Virani, Santos, AA, and Signa were never direct partners in any of the partnerships (notwithstanding Virani's and Santos's promise that they would be partners). Sanvir signed a Management Agreement with AA whereby AA would perform the duties of the managing partner in exchange for the profits due to Sanvir under the Partnership Agreements; the Management Agreements are virtually identical for each partnership.

Between March 1988 and December 1989, the investing partners contributed $16.9 million toward the six partnerships; of that, $6,738,950 came from the Plaintiffs. Over time, Plaintiffs contributed an additional $3,248,406, bringing their total contribution to just under $10 million. In some instances, Abaco advanced the funds necessary to meet capital calls to investors; some, but not all, of those advances were repaid.

5

Plaintiffs allege four distinct types of wrongdoing by the Defendants in connection with these ventures. The first type of misconduct (the "land price fraud") relates to the partnerships' early days in 1988-89; the other three types of misconduct extended into the 1990s, although the bulk of the harm was inflicted early in that decade.

The land price fraud relates to how the advertised tracts of land came into the ownership of the partnerships. According to Plaintiffs, the partnerships did not acquire the relevant properties in arms-length transactions from unrelated third parties. Instead, Santos and Virani would use investor funds to take title to each property in the name of one of their companies (AA or Signa), and then transfer the property to the appropriate partnership at a different and inflated price (up to three times what Santos and Virani actually paid). The inflated prices were reported to the investors as the cost of the properties, with no disclosure of the initial transactions. Plaintiffs' expert put the total unauthorized profit to Defendants from these transactions at approximately $10 million. In addition to that alleged wrongdoing, Santos's and Virani's companies had promised to contribute $2.4 million of their own money as a share of the partnerships' initial capital, but in fact contributed only $144,600, to just one of the six partnerships.

6

Plaintiffs alleged that Defendants took elaborate steps to conceal their land price fraud, altering the partnerships' books and records and distributing false status reports. Plaintiffs also alleged that Defendants used the mail and the telephone wires in furtherance of the fraud, and also engaged in money laundering to conceal their so-called "secret profits." Among other things, Defendants allegedly wrote bogus receipts with the assistance of Padilla and Gonzalez suggesting that companies affiliated with Defendants had performed services for the partnerships, when in fact no such services had been performed.

The second type of fraud allegedly perpetrated by Defendants related to their taking of "reimbursement" payments for actual and made-up expenses relating to the operation of the partnerships. Among other things, partnership funds were allocated to Defendants under the guise of "general overhead" as well as salary to Virani. Plaintiffs claim that these payments were concealed from them, and violated the relevant agreements.

The third type of alleged fraud concerned the Defendants' taking as "brokerage commissions" approximately 10% of the income received from the partnerships' eventual property sales. These commissions were generally described on the partnerships' records as going to a real estate broker named Peggy Weiss; Weiss, however, never received the checks, which were instead endorsed

7

by Virani and deposited in Defendants' bank accounts. Virani allegedly paid Weiss $750 per month to use her name on the commission checks. These arrangements were neither authorized nor disclosed, according to Plaintiffs. All told, Virani paid himself and AA $1.2 million in commissions.

Finally, the fourth type of fraud concerned the Defendants' use of partnership funds to pay for fees and costs relating to this lawsuit, which began in June 1997. Defendants used partnership funds to cover their own expenses as well as the fees of counsel. This practice was disclosed only during a deposition midway through the lawsuit. Plaintiffs say that they never consented to such a use of their contributions, and that Defendants have never returned any of the money siphoned off for use in this litigation. Defendants apparently claimed reliance on several opinions of counsel to the effect that they did not need to seek the consent of the partners, and that they had at least the potential of indemnification if they ultimately prevailed in the case.

At trial, Plaintiffs' damages expert, Dr. Stephen Silberman, calculated the total amount lost by the Plaintiffs individually and collectively for each of the four types of fraud. Total "out-of-pocket" losses were put at approximately $4.3 million for the land fraud (reflecting the money that should have remained with the partnerships if the land had been purchased at arms-length prices); $1 million for

8

the expenses fraud; $400,00 for the commissions fraud; and $337,000 for the attorneys' fees fraud. Silberman also calculated "lost value" damages reflecting the amount of money that each Plaintiff would have earned if the funds taken by Defendants pursuant to each type of fraud had been available for investment in U.S. real estate as Plaintiffs intended.[4]

## II.

Plaintiffs filed their complaint in June 1997, seeking relief under multiple theories, including civil RICO, 18 U.S.C. § 1964, as well as fraud, breach of fiduciary duty, breach of contract, constructive trust, and accounting under Georgia law. Defendants filed counterclaims plus a third-party complaint against Abaco.[5] On March 4, 1999, the district court granted partial summary judgment in Defendants' favor on all claims against Padilla, Gonzalez, Savoy, and Sanig. It also granted summary judgment in favor of the remaining Defendants -- Virani, Santos, AA, Signa, and Sanvir -- on Plaintiffs' claims for breach of contract, conversion, constructive trust, and participation in breach of fiduciary duty. Finally, the court granted summary judgment against 15 Plaintiffs on their fraud claims.

---

[4]Silberman did not offer an opinion regarding what specific amount of each individual Plaintiff's out-of-pocket or lost value damages could be attributed to which type of fraud.

[5]Those claims were later dismissed, in a ruling which has not been appealed.

9

The case proceeded to trial on three of Plaintiffs' theories: RICO, fraud, and breach of fiduciary duty. Plaintiffs cited seven predicate acts for their RICO claim, including money laundering, mail and wire fraud, receiving stolen funds, using interstate travel facilities to launder money, transporting persons for purposes of fraud, and transporting funds taken by fraud. At several points during trial, Defendants moved unsuccessfully for judgment as a matter of law.

After four weeks of trial, the jury rendered a verdict on October 8, 1999, in favor of the each of the Plaintiffs on all three theories of liability. The verdict form asked the jury to state the amount of damages to be recovered by each Plaintiff on each theory. The verdict form did not differentiate between out-of-pocket damages and the lost value damages discussed by Plaintiffs' expert. The amount awarded to each Plaintiff varied, but the amount awarded to each Plaintiff on his or her RICO claim was always identical to the amount awarded on his or her breach of fiduciary duty and fraud claims. The total amount of damages awarded by the jury was $6,078,000. Each Plaintiff also received exemplary damages on the fraud and/or breach of fiduciary duty claims (but not the RICO claim). The exemplary damages totaled $2,691,000. No motion for new trial was made.

After the verdict Plaintiffs elected to have judgment entered on the RICO claim alone. The district court then trebled the damages in accordance with RICO,

10

and ultimately entered a total judgment of $18,234,000 against the remaining Defendants (Virani, Santos, AA, Signa, and Sanvir) and in favor of the individual Plaintiffs. The district court subsequently dismissed the corporate Plaintiffs' claim for an accounting, based primarily on the assumption that the individual Plaintiffs had already recovered damages for harm suffered also by the corporations.

Judgment enforcement proceedings are currently underway in the Northern District of Texas. Virani claimed bankruptcy in that district; on May 15, 2000, however, the bankruptcy court lifted the automatic stay of 11 U.S.C. § 362 for purposes of this appeal. Meanwhile, according to Plaintiffs, Santos has refused to surrender to an arrest warrant for civil contempt issued by the district court in Texas. The warrant was issued after the district court held Santos in contempt for deliberately failing to turn over assets to a receiver appointed to aid in the collection process.[6]

### III.

Defendants raise ten issues for our review. Although none of these objections has merit, one may be dealt with summarily. Defendants assert that the district court improperly failed to provide the jury with a verdict form that would

---

[6]Plaintiffs have moved to dismiss Santos's appeal under the fugitive disentitlement doctrine. Because we affirm the judgment, we deny that motion as moot.

have asked the jury to break down for each Plaintiff the amount of recovery

attributable to each of the four categories of wrongdoing (e.g., the land price fraud,

commissions, expenses, and legal fees).  Accordingly, say the Defendants, if we

were to conclude that the district court erred in its handling of even one of the four

categories of wrongdoing, then we would have to vacate the entire verdict and

remand for a new trial on damages.[7]  Because -- as discussed below -- we find no

reversible error in the district court's handling of those or any other issues,

Defendants' concern is unfounded.

## A.

We first address the question of standing.  Defendants contend that the

district court erred by failing to enter judgment as a matter of law against the

Plaintiffs with respect to their claims for damages based upon wrongdoing after

December 1991, because they lacked RICO standing as to those claims.

Defendants also say that we must order a new trial on damages because the jury's

verdict did not distinguish between pre-and post-1991 harm.  Whether a plaintiff

has standing to assert a RICO claim is a "threshold legal issue subject to de novo

---

[7]A district court's decisions regarding the submission of a verdict form, and the contents of such a form if given, are reviewed with great deference.  See, e.g., Davis v. Ford Motor Co., 128 F.3d 631, 633 (8th Cir. 1997).  There is no suggestion by the Defendants that the verdict form used by the district court in this case was itself unfairly prejudicial to them or unduly confusing to the jury, making inapposite Defendants' citation to Overseas Private Investment Corp. v. Metro Dade County, 47 F.3d 1111, 1116 (11th Cir. 1995).

12

review." Andrews v. American Tel. & Tel. Co., 95 F.3d 1014, 1022 (11th Cir. 1996). We find no reversible error on this record.

Defendants contend that the Plaintiffs lack standing to recover for harm arising out of Defendants' alleged misconduct after December 1991. As of that date, all of the Plaintiffs transferred their partnership interests to six offshore corporations created specifically to consolidate the Plaintiffs' respective interests in the six properties. For example, all of the Plaintiff-partners in the Foxfire Estates Partnership transferred their shares to a new corporation called Heron, which then replaced those Plaintiffs as a partner.[8] The corporations were formed with the assistance and at the urging of Defendants' agents. Defendants argue that any harm caused by their post-1991 misconduct was suffered by the corporations, and only remotely by the Plaintiffs. Accordingly, they say, Plaintiffs lack standing to recover for that harm on their own, but must instead seek those damages, if at all, in the name of the corporations. We disagree.

In Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc., 140 F.3d 898 (11th Cir. 1998), we ruled that "a party whose injuries result 'merely from the misfortunes visited upon a third person by the defendant's acts' lacks standing to pursue a claim under RICO." Id. at 906. As we explained, "RICO

---

[8]The corporations thereafter controlled 80-90% of the partnerships.

13

standing will not arise solely because one is a shareholder or a limited partner in a company that was the target of the alleged RICO violation. Such an injury is too indirect or 'derivative' to confer RICO standing." Id. (citations omitted). We have emphasized, however, that simply because the plaintiff is a shareholder of a corporation, it does not necessarily follow that he lacks standing to seek RICO damages in his own right. There is no bright-line rule for determining when an individual who is also a corporate shareholder sues under § 1964 to recover for a RICO violation that affects both the individual and the corporation. The inquiry is inherently fact-specific.

In Beck v. Prupis, 162 F.3d 1090 (11th Cir. 2000), for example, we rejected the argument that a civil RICO plaintiff lacked standing because he was allegedly harmed only in his capacity as a creditor and stockholder of a corporation. The plaintiff, Beck, was a former employee and director of the corporation. He alleged that he was fired and fraudulently induced to make unwise personal financial investments by the corporation's other directors. The district court held that Beck's injuries were based on his status as a creditor and stockholder, and that his injuries were therefore too indirect to give him standing under RICO. We held otherwise:

> The district court is correct that a creditor or stockholder lacks
> standing when his claim is based solely on acts of racketeering that

14

> target the corporation. See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc., 140 F.3d 898, 906 (11th Cir. 1998); Warner v. Alexander Grant & Co., 828 F.2d 1528, 1530 (11th Cir. 1987). A plaintiff's status as a creditor or stockholder, however, does not preclude standing for RICO violations if the plaintiff has alleged an injury proximately caused by the defendants' acts of racketeering that target the plaintiff. See id. at 1530-31. In this case, Beck has properly set forth claims of injury proximately caused by racketeering activity that targeted him. We therefore hold that he has standing under RICO.

162 F.3d at 1096 n.10 (emphasis added).

Likewise, in Bivens, we afforded standing to a plaintiff who was a shareholder and creditor of a corporation where the defendants' conduct affected him in a different way than it affected the corporation and other shareholders. 140 F.3d at 908 (explaining that the allegedly unlawful act "affected creditors in a manner distinct from shareholders, and in a manner sufficiently direct to confer RICO standing on Konstand in his capacity as a creditor"). We specifically observed that, notwithstanding the general rule that a corporation's creditor lacks RICO standing, "it is possible that a pattern of racketeering could be directed specifically at a corporation's creditors." Id. These decisions are consistent with the broader corporate law principle that a shareholder need not proceed by way of a derivative action to redress harm to a corporation where the shareholder "shows a violation of a duty owed directly to him." Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir. 1968).

15

It is plain from this record that Plaintiffs' injuries, before and after formation of the corporations, do not arise "solely" out of a scheme targeting the corporations. Beck, 162 F.3d at 1096 n.10. The evidence at trial established that, from 1988 through formation of the corporations in late 1991, Defendants targeted their wrongful acts at the individual Plaintiffs. Defendants' scheme was not designed to inflict harm on the corporations, but rather to damage the Plaintiffs. Indeed, the majority of the alleged wrongdoing -- including the primary wrong (the land price fraud) -- occurred, and the lion's share of the sought-after damages were incurred, well in advance of the chartering of the corporations.

There is no indication that Defendants' focus changed after formation of the corporations, or that the existence of corporations in any way affected the injury ultimately suffered by the individual Plaintiffs. Defendants cite no evidence that after 1991 their communications and capital calls went solely through the corporations. Indeed, there is evidence that, even after the corporations were formed, Defendants and their agents contacted the individual Plaintiffs and accepted funds from the individual Plaintiffs. Even if that evidence did not exist, the critical fact remains that the original and ongoing purpose of Defendants' scheme was to inflict harm on the individual Plaintiffs by targeting them as individuals.

16

The transfer of partnership interests to the corporations must be viewed against the backdrop of all that came before it. The individual Plaintiffs were always the target of Defendants' scheme, and that did not change after 1991. It is simply impossible, on this record, to say that Plaintiffs' post-1991 claims are based "solely on acts of racketeering that target the corporation[s]," Beck, 162 F.3d at 1096 n.10 (emphasis added), let alone that Plaintiffs' post-1991 injuries resulted "'merely from the misfortunes visited upon a third person.'" Bivens, 140 F.3d at 906 (emphasis added). Concluding that the Plaintiffs lack standing after 1991 would ignore the record and indefensibly elevate form over substance.

Moreover, denying standing in these peculiar circumstances would not serve the principle recognized in Bivens. One of the primary justifications for that principle is the concern that otherwise a civil RICO plaintiff might obtain a "double recovery," collecting damages for the same violation both in his capacity as an individual and in his capacity as a corporate shareholder. To prevent that situation, the law generally provides that the harm inflicted solely on a corporation must be pursued by the corporation alone.

Here, however, there is no risk of a double recovery. After trial, the Defendants argued to the district court that the corporate Plaintiffs could not recover a money judgment on their outstanding claim for an accounting precisely

because damages for any misconduct affecting the corporations had already been awarded to the individual Plaintiffs on their RICO claims.[9] The district court accepted that argument in dismissing the accounting claim and refusing to award any money to the corporate Plaintiffs.[10] Defendants, in other words, highlighted the individual Plaintiffs' recovery of damages for post-1991 harm as a reason to deny damages to the corporate Plaintiffs -- the same corporate Plaintiffs whom Defendants now advise us were the only parties with standing to recover for post-1991 harm.

Defendants cite no case law rejecting standing in a civil RICO action under these circumstances. Bivens denied standing to two plaintiffs who alleged standing solely on the ground that they were shareholders and creditors of the corporation. 140 F.3d at 908. Bivens also denied standing where the plaintiff claimed that the

---

[9]See Defendants' Post-Trial Brief on Accounting, Nov. 19, 1999, at 5-10; Defendants' Supp. Brief in Resp. to Corp. Plaintiffs' Brief on Their Cause of Action for Accounting Under O.C.G.A. § 14-8-21 and 14-8-22, Dec. 9, 1999, at 5 & n.1 ("Plaintiffs presented evidence on damages that accrued after 1991, when the partnership interests were assigned to the Corporate Plaintiffs. . . . It is very likely then that the jury considered evidence of damages that accrued after the individual Plaintiffs transferred their interests to the offshore corporations. Because any damages awarded to the Corporate Plaintiffs via an accounting will pass through the corporations to the shareholders in the form of increased share value and dividends, the individual Plaintiffs, who have already recovered RICO damages, will recover a second time if an accounting is ordered.").

[10]Order of Oct. 18, 2000, at 1-2 ("Allowing a claim for additional damages through the means of an accounting would . . . allow the recovery of double damages. This is not allowed . . . .").

18

defendant's conduct injured him in his capacity as a creditor of the corporation, because the alleged wrongdoing was "aimed primarily at the corporation, not at its creditors." Id. In this case, by contrast, the plaintiffs do not allege standing to sue for post-1991 damages "solely" on the ground that they were shareholders or creditors of the corporations. Nor can we say that the RICO violations alleged in this case were ever aimed "primarily" at the corporations -- indeed, just the opposite is true. Simply put, we cannot say that these Plaintiffs lacked standing to recover damages for Defendants' wrongdoing after 1991 where Plaintiffs' interests were shifted to a corporation, but the pattern of racketeering giving rise to the RICO violation plainly did <u>not</u> shift its focus to those corporations.[11]

B.

---

[11]Even if we were to conclude that under our precedent Plaintiffs could not recover in their own right for damages inflicted after 1991, it would not necessarily follow that Defendants are entitled to a new trial on damages. Defendants had every opportunity to ask the district court to modify the verdict form to require the jury to separate Plaintiffs' pre- and post-1991 damages on the RICO claim. Instead, Defendants did not make that request, and agreed to the submission of a verdict form that did not instruct the jury to separate pre- and post-1991 damages. If Defendants were concerned that the jury would award the individual Plaintiffs damages for misconduct targeted at the corporations, then Defendants surely could have sought a verdict form reflecting that distinction, rather than remaining silent and trying to preserve for possible appeal the argument that the entire damages award must be set aside because no one can distinguish pre- and post-1991 damages. See McCord v. McGuire, 873 F.2d 1271, 1274 (9th Cir. 1989). It therefore does not follow that Defendants' position, even if correct, would entitle them to the discretionary relief of a new trial. We need not decide the issue, however, because Defendants' objection to the Plaintiffs' standing is -- on this record -- unpersuasive.

19

Defendants next contend that the district court erred by failing to instruct the jury regarding the proper interpretation of potentially conflicting contract terms relating to Defendants' entitlement to claim expenses and commissions, and instead leaving the task of contract interpretation to the jury. As Defendants see it, the court should have interpreted the contracts in a manner favorable to them, and then instructed the jury in accordance with that interpretation. Defendants maintain that the relevant contracts authorized their taking of expenses as well as commissions on the partnerships' real estate sales, a proposition at odds with the Plaintiffs' argument that the taking of those proceeds was unauthorized. The district court considered Defendants' argument, but specifically declined to construe the agreements, finding that proper interpretation of the agreements was a fact question properly left to the jury. We agree.

This court reviews the district court's refusal to give a defendant's requested jury instruction for abuse of discretion. See, e.g., United States v. Chirinos, 112 F.3d 1089, 1101 (11th Cir. 1997) (citing United States v. Morales, 978 F.2d 650, 652 (11th Cir. 1992)). "We apply a deferential standard in reviewing jury instructions." Jennings v. BIC Corp., 181 F.3d 1250, 1259 (11th Cir. 1999). Although a district court may abuse its discretion if its decision rests on an incorrect premise of law, see, e.g., United Kingdom v. United States, 238 F.3d

20

1312, 1319 n.8 (11th Cir. 2001), reversal for a new trial is warranted only if the failure to give the instruction resulted in prejudicial harm to the requesting party. See Roberts & Schaefer Co. v. Hardaway Co., 152 F.3d 1283, 1295 (11th Cir. 1998).

The relevant portions of the agreements are as follows:  With respect to expenses, the Partnership Agreement states that the managing partner -- Sanvir -- is entitled to receive its out-of-pocket expenses on behalf of the partnership.  The Partnership Agreement goes on to say that Sanvir and its "employees, agents and representatives" (including, by definition, AA and Virani) are entitled to "reasonable and necessary out-of-pocket expenses," but only those "representing sums payable to unrelated third parties" (emphasis added).  Meanwhile, the Management Agreement between Sanvir and AA (whose terms are binding on the partners) states that AA in its role as manager "shall receive proper reimbursement for all out-of-pocket costs and expenses incurred in connection with the performance of its duties and obligations hereunder."

As for commissions, the Partnership Agreement does not contain any provision authorizing the taking of commissions.  Moreover, the Partnership Agreement precludes the manager (AA) and the managing partner (Sanvir) from claiming any sort of management fee until after the partners' contributions have

been repaid plus interest. The Management Agreement, however, states that real estate "sales consummated by [AA] or any of its principals, affiliates, agents, employees, or representatives who are licensed real estate agents or licensees shall entitle it to receive commissions at the customary rates in the State of Georgia at the time of such sales."

The district court effectively treated these provisions as ambiguous, and left it to the jury to decide whether and to what extent they authorized the Defendants' taking of expenses and commissions in these circumstances. Both sides presented testimony and argument at trial regarding the scope of these provisions. By its verdict, the jury necessarily concluded that the agreements did not fully authorize the Defendants' taking of partnership funds for expenses and commissions.

Defendants argue in essence that the district court should not have left the task of contract interpretation to the jury. Instead, say Defendants, the Court should have instructed the jury that the Management Agreement is decisive on this issue, trumps any conflicting language in the Partnership Agreement, and unambiguously permits the use of partnership funds for the payment of expenses and commissions to the Defendants or, at the very least, AA. Although Plaintiffs occasionally assert that the agreements read together unambiguously forbid such payments, they ultimately respond that whether "the partnership agreements and

22

the management agreements authorized Defendants to pay themselves millions of dollars in commissions and salaries from partnership funds was an issue properly resolved by the jury."

Georgia law -- which the parties agree governs interpretation of the contracts -- plainly contemplates that questions of contract interpretation may be submitted to a jury. As we explained in St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815 (11th Cir. 1999): "Under Georgia law, '[t]here are three steps in the process of contract construction. The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (O.C.G.A. § 13-2-2); if after doing so the trial court determines that an ambiguity still remains, the jury must then resolve the ambiguity.'" Id. at 819 (citing Georgia-Pacific Corp. v. Lieberam, 959 F.2d 901, 904 (11th Cir. 1992) (quoting Copy Sys. of Savannah, Inc. v. Page, 398 S.E.2d 784, 785 (Ga. 1990))).

> [T]he "cardinal rule of construction is to ascertain the intention of the parties." When attempting to ascertain the intent of parties to a contract, the court should consider the language of the contract in light of the surrounding circumstances . . . . Enforcement of the parties' intent is superior to the other rules of construction, "if that intention is clear," the parties used "sufficient words . . . to arrive at the intention," and "it contravenes no rule of law." If, however, after applying the rules of construction, the intent of the parties continues to be disputed and capable of more than one interpretation, then it is a

23

"factual matter for resolution by the jury and not a matter of law for determination by the court."

St. Charles Foods, 198 F.3d at 820 (citations omitted). Particularly important for this case, Georgia law also contemplates that contracts executed together as part of the same transaction should generally be construed together. See Barton v. Olshan, 260 S.E.2d 83, 83 (Ga. 1979); Rizk v. Jones, 255 S.E.2d 19, 20 (Ga. 1979); Empire Distrib., Inc. v. George L. Smith II Georgia World Cong. Ctr. Auth., 509 S.E.2d 650, 653 (Ga. App. 1998).

The core question is whether these agreements, viewed alongside each other, are sufficiently ambiguous regarding the Defendants' ability to claim commissions and expenses that the issue could have been left to the jury, rather than decided by the court and set out for the jury in an instruction. It is essential to keep in mind, however, that no claim for breach of contract was ever submitted to the jury; rather, the meaning of the contract terms had significance only to the extent they affected resolution of Plaintiffs' RICO and state law claims. Accordingly, even if the jury had been instructed regarding the contracts in the manner Defendants suggest, that would not necessarily have entitled Defendants to judgment on Plaintiffs' RICO claim. The district court's latitude to submit an issue of contract interpretation to the jury -- which Georgia law undeniably allows -- is surely even

greater when terms of the contract are not dispositive of the claim and the claim in other respects is marked by substantial factual disputes.

In any event, we find no error in the district court's refusal to instruct the jury as Defendants wished. The agreements are ambiguous in light of the relevant case law and Georgia's statutory rules of construction. With respect to expenses, although the Management Agreement seemingly allows AA to recover its out-of-pocket expenses, the Partnership Agreement can fairly be read to address the same subject in a contrary way, by forbidding the use of partnership funds by Sanvir or its "employees, agents and representatives" for out-of-pocket expenses unless payable to "unrelated third parties."

Defendants assert that, if the expenses language in the Management Agreement was not meant to loosen the pertinent language of the Partnership Agreement, then the relevant clause of the Management Agreement -- which was drafted after the Partnership Agreement -- would serve little purpose. See O.C.G.A. § 13-2-2(4) ("The construction which will uphold a contract in whole and in every part is to be preferred."). Moreover, Defendants contend that the term "unrelated third parties" as used in the Partnership Agreement cannot be read to

establish a conflict between that agreement and the Management Agreement.[12]

Defendants rely on testimony from the agreements' drafter, Randall Lipshultz, who said that the term "unrelated third parties" simply means non-partners, such that expenses payable to an entity like AA -- which was controlled by a partner, but was not a partner itself -- or a person like Virani -- who promised to become a partner, but never did -- were permissible.

That interpretation, however, is at odds with the ordinary meaning of "unrelated third parties," which would seem to exclude not only partners such as Sanvir, but also persons or entities (such as Virani or AA) who own, or are affiliates of, a partner. See O.C.G.A. § 13-2-2(2) (words in a contract "generally bear their usual and common signification").[13]  Defendants' interpretation also

---

[12]Defendants suggest in their reply brief that "the meaning of 'unrelated third parties' in the Partnership Agreements is irrelevant" because payments for expenses were always made to AA under the Management Agreement rather than to Sanvir under the Partnership Agreement. This argument, of course, does nothing to advance Defendants' position that the district court misapplied the applicable law governing contract interpretation. Moreover, the questions of which Defendants were the actual recipients of partnership funds for expenses or commissions, and the manner in which those funds were distributed, are plainly ones of fact resolvable by the jury. From our own review of the record, we find ample evidence demonstrating that the flow of partnership funds into and among the Defendants' accounts was complicated, if not calculated to mislead.

[13]Tellingly, although Defendants' accountant, Hoyte Veazey, professed that he was not familiar with how the term was used in the contracts, he specifically described Virani, AA, and Sanvir as "related parties" within the meaning of the tax code. Defendants' bookkeeper, David Patterson, likewise testified that these were not unrelated third parties. Indeed, when asked whether the expenses claimed by AA and Virani were "out-of-pocket expenses to an unrelated third party," Patterson answered no.

26

collides with the well-settled principle that doubts in a contract are construed strongly against the drafting party. See id. § 13-2-2(5); Empire Distrib., 509 S.E.2d at 654. Finally, Lipshultz -- a long-time attorney for Virani and AA -- merely offered his own view of the meaning of the term "unrelated third parties"; the value of that testimony as evidence of the parties' intent could fairly be described as minimal. Cf. O.C.G.A. § 13-2-2(1) ("Parol evidence is inadmissible to add to, take from, or vary a written contract.").

Simply put, the record evidence regarding the parties' intent is inconclusive, and the rules of construction do not clearly resolve how the language in the Management Agreement fits with the potentially conflicting language in the Partnership Agreement regarding the use of partnership funds for salaries and other expenses incurred by related non-partners such as AA and Virani. On this record, and given Georgia law, we cannot say that the district court erred by allowing that issue to go the jury.

Likewise, the district court did not err on this record by allowing the jury to decide when, if at all, the agreements allowed the Defendants to take commissions. The Partnership Agreement does not give any Defendants the right to claim commissions. The agreements also specifically preclude the managing partner (Sanvir), the manager (AA), and their agents from claiming any kind of

27

management "fee" prior to the time the investors are repaid plus interest. The Management Agreement, by contrast, expressly permits commissions, and Defendants argue that this language is meaningless if we construe the Partnership Agreements as an expression of intent to forbid the taking of commissions. Once again, the intent of the parties is not clear on this record. Moreover, the Management Agreement may be susceptible to different readings on several key points, such as whether commissions, if recoverable at all, may be recovered solely by AA (the most plausible reading) or also by its agents (the reading assumed by Defendants). We are not convinced that the district court erred by allowing the jury to determine the proper interpretation of these terms, and a new trial is not warranted on this basis.[14]

C.

---

[14]Plaintiffs assert that, even assuming Defendants' interpretation of the agreements is correct, what Defendants did here was plainly forbidden and therefore a rational jury would have found against them even if Defendants' desired instruction were given. Plaintiffs contend that the salaries claimed by Virani were not "out-of-pocket expenses," that the claimed expenses were almost never "reasonable," and that Defendants produced no receipts. Plaintiffs also contend that neither Weiss nor Virani was licensed in Georgia, and thus neither was entitled to claim a commission on sales of the partnerships' Georgia real estate. Plaintiffs further observe that the manner in which Virani went about claiming commissions (using Weiss as a front) is powerful evidence that he did not believe in good faith that he was entitled to claim commissions. Although we are inclined to agree with Plaintiffs' arguments, we need not decide the issue, as there was no error in the district court's refusal to instruct the jury in accordance with Defendants' wishes, and therefore we do not reach any question of prejudice.

28

In a related argument, Defendants assert that the district court erred by failing to enter judgment as a matter of law on Plaintiffs' claims for improper taking of commissions and expenses because the Plaintiffs knew that these items would be, and were, taken. They assert that no damages for expenses and commissions should have been awarded, given that all of the Plaintiffs had notice that Defendants "were to receive" payment for these items. As support for this argument, Defendants rely in part on the contract language discussed above; as explained, however, the relevant contract language was not so clear regarding the Defendants' entitlement to commissions and expenses that Plaintiffs were thereby placed on notice that Defendants would act as they did. Plaintiffs are obviously charged with knowledge of the contracts, but what those contracts mean was, in this context, a question properly reserved for the jury.

Defendants also cite testimony by a few Plaintiffs to the effect that these Plaintiffs knew commissions would be going to AA, or that AA was entitled to receive reimbursement for operating expenses. Plaintiffs respond that Defendants mischaracterized the snippets of testimony that they cite. Having reviewed the record, we agree that the testimony cited by the Defendants does not carry the weight they attach to it. The record does not remotely establish that the Plaintiffs were aware that Defendants would obtain expenses and commissions for the items,

and in the manner, that they did. At best, the record demonstrates that some Plaintiffs believed ahead of time that Defendants could, in certain circumstances, demand expenses or commissions. There is no showing that any Plaintiff had sufficient notice of what Defendants actually were doing, and subsequently gave his or her approval. Reading the evidence in the light most favorable to the Plaintiffs, as we must when reviewing a jury verdict in their favor, we do not believe the district court erred by refusing to enter judgment as a matter of law on grounds of notice with respect to the Plaintiffs' claims for improper expenses and commissions.

D.

Defendants next assert that the district court should not have allowed Plaintiffs to present evidence through their expert economist, Dr. Stephen Silberman, regarding "lost value" damages as part of their RICO claim. Silberman provided the jury with his calculation of the amount of money that Plaintiffs would have earned if the proceeds that Defendants pocketed through their frauds had been invested in U.S. real estate. He based this calculation on an estimate of the return that would have been generated if the equivalent funds had been placed in a real estate investment trust ("REIT"), using as his benchmark the performance of a broad-based REIT index during the relevant period. Silberman identified the lost

value damages at $11,596,395 for all Plaintiffs. The verdict, which did not differentiate between "out-of-pocket" damages and lost value damages, totaled $6,078,000, virtually equivalent to Silberman's estimate of Plaintiffs' overall out-of-pocket losses ($6,062,615).

Defendants raise three categories of objections. Defendants initially contend that, as a matter of law, these lost value damages are not recoverable in a civil RICO action. They also contend that Silberman's assumptions -- particularly his assumption that the performance of a REIT index is an appropriate gauge for the returns that Plaintiffs would have generated on the pilfered funds -- are too speculative. Finally, they contend that Silberman's testimony should have been struck under the Federal Rules of Evidence and the Supreme Court's analysis in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

Our review of the district court's decision to admit Silberman's testimony is very limited. We review a trial court's evidentiary rulings on the admission of expert witness testimony only for abuse of discretion. See, e.g., Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1312 (11th Cir. 2000) (citing General Elec. Co. v. Joiner, 522 U.S. 136, 142, 118 S. Ct. 512, 517 (1997)). When employing an abuse of discretion standard, "'we must affirm unless we at least determine that the

district court has made a clear error of judgment, or has applied an incorrect legal standard.'" Alexander v. Fulton County, 207 F.3d 1303, 1326 (11th Cir. 2000) (quoting SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1333 (11th Cir. 1996)); see also Joiner, 522 U.S. at 143, 118 S. Ct. at 517 (reiterating that "deference [is] the hallmark of abuse of discretion review"). We find no reversible error in the admission of this testimony.

Defendants first assert that courts do not award the kind of lost value damages that Plaintiffs seek here. They contend that in cases where lost profits were allowed, the profits were either "bargained for or within a longstanding transactional history that [was] diminished as a result of the defendants' misconduct." Defendants maintain that what Plaintiffs seek here is akin to an award of prejudgment interest, which they say is forbidden by RICO.

These broad arguments against Plaintiffs' lost value theory are not persuasive. To recover damages for an injury sustained as a result of a RICO violation, a plaintiff must prove that the violation proximately caused a loss to its business or property. See, e.g., Holmes v. Securities Invest. Prot. Corp., 503 U.S. 258, 267-68, 112 S. Ct. 1311, 1317 (1992). The touchstone of the inquiry, in other words, is proximate cause; there is no automatic rule against the recovery of any type of lost profits or lost value damages if proximate cause is shown.

We note as well that courts have contemplated the availability under RICO of lost value or lost profits damages sufficiently similar to those sought here. In Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1343 (2d Cir. 1994), for example, the Second Circuit upheld an award of profits to a contractor who established that the defendants' RICO conspiracy caused it to lose contracts which it might have obtained but for the illegal conduct. In Moore v. PaineWebber, Inc., 189 F.3d 165 (2d Cir. 1999), the court reversed the grant of a motion to dismiss a RICO claim which alleged that, but for the defendants' fraud, the plaintiffs would not have purchased the defendants' investment packages, but would instead have invested their funds in a different package. The court explained that the plaintiff adequately alleged a cause of action to recover "the foregone returns of the alternative IRA or other retirement savings plan in which, but for PaineWebber's misrepresentations, the plaintiffs . . . would have placed the money that they put into [PaineWebber's plan]." Id. at 172. District court rulings are in accord. See, e.g., Frankford Trust Co. v. Advest, Inc., 943 F. Supp. 531, 532 (E.D. Pa. 1996); Sound Video Unlimited, Inc. v. Video Shack Inc., 700 F. Supp. 127, 142 (S.D.N.Y.

1988); <u>DeMent v. Abbott Capital Corp.</u>, 589 F. Supp. 1378, 1385 (N.D. Ill. 1984).[15]

The cases upon which Defendants rely do not preclude the kind of lost value damages that Plaintiffs sought here, and certainly do not establish the artificial and awkward principle that these kinds of damages are available only when they are "bargained for or within a longstanding transactional history." In <u>Fleischhauer v. Feltner</u>, 879 F.2d 1290 (6th Cir. 1989), for example, the plaintiffs alleged that the defendants' RICO violations caused them to make an investment they otherwise would not have made. The court allowed the plaintiffs to recoup the value of their investment, but did not allow them "under these circumstances" to recover damages equivalent to the profits they would have earned if the investment had

---

[15]Defendants' analogy to prejudgment interest is flawed. To begin with, there is a conceptual distinction between lost profit or lost value damages and prejudgment interest. Among other things, prejudgment interest does not require any proof of causation. <u>See</u> <u>Multi-Flex, Inc. v. Samuel Moore & Co.</u>, 709 F.2d 980, 996-97 (5th Cir. 1983) (allowing recovery of "lost opportunity" damages in an antitrust case where the plaintiff alleged that defendants' conduct had deprived it of market share, because such a recovery was conceptually different from prejudgment interest, which at that time was unavailable under the relevant statutes). Accordingly, even if prejudgment interest were unavailable under RICO, that would not preclude a plaintiff from recovering these kinds of damages so long as they were proximately caused by the RICO violation. Second, contrary to Defendants' assertion, courts have <u>not</u> read RICO to preclude prejudgment interest. <u>See</u> <u>Aetna Cas. Sur. Co. v. P & B Autobody</u>, 43 F.3d 1546, 1571 (1st Cir. 1994) (decision as to whether to award prejudgment interest under RICO is left to district court's discretion); <u>Abou-Khadra v. Mahshie</u>, 4 F.3d 1071, 1084 (2d Cir. 1993) (RICO statute does not contain provision barring prejudgment interest, and any such award is discretionary). Although we need not and do not decide the issue today, we observe that Defendants cite no federal Court of Appeals decision holding prejudgment interest unavailable as a matter of law under § 1964.

panned out as promised.  Id. at 1300-01.  To explain its ruling, the court

emphasized the absence of "realistic evidence . . . as to a reasonable value or

estimate of lost profits or of the 'bargain' based on analogy, experience, or

practice."  Id. at 1300.[16]  The Sixth Circuit did not erect a per se barrier to lost

value damages; rather, it fully acknowledged that "[a] plaintiff injured by civil

RICO violations deserves a 'complete recovery,'" and recognized that "in some

cases expectancy damages might be appropriate."  Id.

We conclude, in short, that there is no statutory constraint on Plaintiffs'

recovery of lost value damages in these circumstances.  Silberman's testimony was

not inadmissible for this reason.  The recoverability of these kinds of damages is a

function of proximate cause, and must be assessed on a case-by-case basis.

Defendants next argue that the Plaintiffs established no foundation for an

award of lost value damages based upon testimony regarding what the pilfered

money would have earned had it been invested in U.S. real estate, or, more

specifically, a REIT.  We disagree.  "Suffice it to say that while damages may not

---

[16]The other problem in Feltner was that the Defendants' RICO violation did not proximately cause the asserted lost value damages.  As the court explained, "[t]he conduct of the defendants in the case at bar caused the parties to invest . . . but it did not cause the investment items to become less profitable than defendants represented."  Id. at 1300.  In this case, by contrast, proximate cause was established.  The jury could have found (and presumably did find) that Defendants' RICO violations deprived the Plaintiffs of the use of their investment dollars, and that the Plaintiffs would have re-invested the funds if they had been available for use.

35

be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference." G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1539 (11th Cir. 1985) (internal quotation marks omitted).

The district court acted within its discretion by allowing Silberman to testify based upon his assumption that the performance of a REIT index was an appropriate benchmark for gauging the profits that Plaintiffs would have earned if the pilfered funds had been used in accordance with their expectations and the law. Silberman testified that he assumed that the Plaintiffs would have invested the pilfered funds in U.S. real estate. He also testified that the performance of a REIT index was an appropriate yardstick for measuring the performance of U.S. real estate generally during the relevant period. Defendants contend that there is no evidence that the Plaintiffs would have invested in U.S. real estate if their investment dollars had not been available for lawful use in this specific venture. But the fact that Plaintiffs did invest in U.S. real estate on this occasion is persuasive evidence that they had earmarked the funds they contributed to the Defendants specifically for U.S. real estate. Although that proposition may be debated (and indeed, Defendants challenged it vigorously during cross-examination), it is enough to support the admission of Silberman's testimony,

36

especially in conjunction with evidence that some Plaintiffs actually did invest in U.S. real estate on other occasions.[17] Moreover, notwithstanding Defendants' argument that REITs are too risky and unpredictable to be cited as a yardstick for measuring the performance of real estate, there is sufficient evidence to support Silberman's use of the broad-based REIT index which he employed in this case.

The district court, having considered Silberman's testimony in and out of the presence of the jury, concluded that there was a sufficient foundation for Silberman's assumptions, and Defendants had ample opportunity to cross-examine Silberman about those assumptions. We find no reversible error.

Defendants' Daubert challenge fails largely for the same reasons. As we explained in City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548 (11th Cir. 1998), for expert testimony to be admissible under Rule 702 of the Federal Rules of Evidence, the proponent of the testimony must show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2)

---

[17]The lost value damages estimated by Silberman using the REIT index approximated the profits that Plaintiffs would have made on the pilfered funds if the venture had achieved its expected eventual return of 12%. Defendants argue that Silberman had no basis to offer that comparison during his testimony, given that the Defendants expressly stated in their documents that no particular return could be guaranteed. But the fact that Defendants did not guarantee a 12% return does not eliminate the relevance of that estimate to establishing the reliability of Silberman's assumptions. Nor was the admission of testimony regarding the comparison an abuse of discretion. It was made clear to the jury, through Silberman's direct testimony and on cross-examination, that Plaintiffs' estimate of lost value damages was based upon the REIT calculations, not the expected return of the venture.

the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Id. at 563 (citing Daubert, 509 U.S. at 589, 113 S. Ct. at 2794). Daubert itself stresses that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." Id. at 594, 113 S. Ct. at 2797. "Many factors will bear on the inquiry, and [there is no] definitive checklist or test." Id. at 593, 113 S. Ct. at 2796.

Defendants argue that Silberman was not qualified to offer an opinion regarding Plaintiffs' lost value damages. This argument is not convincing. The record demonstrates that Silberman has a Ph.D. in economics from Yale, extensive experience as a professional economist, and a substantial background in estimating damages. The subject matter of his testimony -- calculating the economic losses suffered by the Plaintiffs as a result of Defendants' conduct -- was sufficiently within his expertise. Defendants insist that Silberman has no real estate development experience and thus no basis to opine regarding how the pilfered funds would have been invested by the Plaintiffs. That objection, however, goes more to the foundation for Silberman's testimony than it does to his qualifications

38

to calculate Plaintiffs' damages. As set forth above, we conclude that there was an adequate foundation for Silberman's core assumptions.

Defendants' other <u>Daubert</u> objections likewise relate more to foundation than they do to Silberman himself. Defendants assert that Silberman's analysis is unreliable because the methods he used to estimate Plaintiffs' lost profits were unsound. In particular, Defendants say that Silberman was unfamiliar with the individual Plaintiffs, conducted no original research regarding the use of REITs as an alternative investment, and adopted a damages theory that was essentially unverifiable. Defendants further argue that Silberman's testimony did not help the jury because there was no "fit" between the facts of the case and his assumptions regarding REITs and Plaintiffs' lost value damages.

We are not persuaded by these arguments. Silberman's theories and methodology were sufficiently reliable. The damages model adopted by Silberman was not, in our view, unusually complex, and his use of a broad-based REIT index to estimate the performance of U.S. real estate was not without foundation. The cases cited by Defendants are therefore plainly distinguishable. <u>Compare</u> <u>Three Crown Ltd. P'ship v. Salomon Bros., Inc.</u>, 906 F. Supp. 876, 894 (S.D.N.Y. 1995) (declining to admit expert damages testimony where the proposed expert's opinions were based on a novel and "intricate series of complicated calculations"

39

which yielded excessive damage figures resting upon "numerous assumptions without the type of support required").

We likewise reject Defendants' complaints about Silberman's supposed lack of familiarity with the Plaintiffs, for the reasons stated above. Notably, Silberman specifically opined that most economists would not (as Defendants insist) have interviewed individual Plaintiffs to evaluate what those parties would have done with the pilfered funds, given the high risk that their responses would be distorted by hindsight. Although Silberman's testimony was certainly subject to attack by the Defendants -- and attack it they did, vigorously, on cross-examination -- it met the threshold requirements of Daubert.

A district court's gatekeeper role under Daubert "is not intended to supplant the adversary system or the role of the jury." Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999). "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596, 113 S. Ct. at 2786). The district court, having carefully considered Silberman's testimony and Defendants' objections, did not abuse its discretion by admitting this expert testimony. See United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999) ("'[F]ederal district courts . . . perform [their]

important gatekeeping function by screening the reliability of all expert testimony, but they have substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable.'"); see also G.M. Brod, 759 F.2d at 1539-40 (upholding jury verdict awarding lost profits notwithstanding defendant's argument that the testimony of plaintiff's expert on the subject was speculative and based on faulty assumptions).

E.

Defendants next challenge under Daubert the district court's refusal to limit the testimony of Plaintiffs' liability expert, Kenneth Barker. Barker, an accounting partner at Arthur Anderson, was qualified as a forensic accounting expert with an expertise in detecting and tracing the misappropriation of funds in complex financial transactions. Defendants argue that Barker was not entitled to testify in his capacity as an expert regarding the meaning of the parties' contracts. According to Defendants, Barker repeatedly offered "legal" opinions regarding the effect of disputed provisions in the Partnership and Management Agreements, including provisions addressing Defendants' entitlements to commissions and expenses. Plaintiffs counter that Barker did not offer legal conclusions, but merely stated the assumptions necessary to his opinions regarding the flow of funds through the Defendants' accounts.

41

We find no reversible error in the admission of Barker's testimony.[18] Defendants contend that Barker, a non-lawyer, is not qualified to opine on the legal effect of the agreements. Defendants also contend that Barker's statements about the agreements are unreliable and do not "fit" the facts because his own assumptions are based largely on the assumptions of others regarding the import of contract language and the applicable law. But Barker is certainly qualified to opine on forensic accounting issues, and as part of that process he was entitled to state reasonable assumptions regarding the requirements of the applicable contracts in order to put his opinions in context. Our review of Barker's testimony confirms that, to the extent he spoke of the contracts, he generally did so in the context of setting forth or explaining reasonable assumptions he was asked to make by counsel. Although Defendants challenge many of those assumptions as unfounded, that argument simply reflects their own view of the agreements -- a view we do not share in this context.

Even assuming that some small portion of Barker's testimony should in hindsight have been excluded, Defendants would still not be entitled to a new trial. We will not overturn an evidentiary ruling and order a new trial unless the

---

[18]Defendants assert that Barker offered numerous legal opinions, but in many instances cite only to Barker's deposition or pre-trial expert report rather than his testimony at trial.

objecting party has shown a substantial prejudicial effect from the ruling.  See, e.g.,

Alexander, 207 F.3d at 1326; Judd v. Rodman, 105 F.3d 1339, 1341 (11th Cir.

1997); Samples v. City of Atlanta, 916 F.2d 1548, 1552 (1990).  Defendants

cannot make that showing on this record.

To begin with, Defendants had ample opportunity to cross-examine Barker

vigorously about the sources and content of his assumptions.   Defendants' cross-

examination was extensive, and undeniably made plain to the jury their

disagreement with Barker's assumptions regarding the contracts.  Moreover, the

district court properly instructed the jury regarding Barker's role in the trial.  We

have recognized that an instruction may be used to prevent a jury from placing too

much weight on an expert's legal conclusions.  See, e.g., United States v. Gold,

743 F.2d 800, 817 (11th Cir. 1984) (decision to admit expert testimony about

ultimate legal issue in the case upheld where district court was "careful to instruct

the jury about the weight that should be given expert testimony such as [this]").

On its own initiative during Barker's direct testimony, the court informed the jury

as follows:

> Ladies and gentlemen of the jury, I'm going to give you an instruction later on expert witnesses.  But I'm going to inform you right now that Mr. Barker is testifying to his opinion as an expert that these various funds were taken inappropriately.  That's ultimately the issue you're going to have to decide, and you may consider Mr. Barker's opinion and give it whatever weight and credit you choose . .

. but I want you to understand that it is for you to decide whether these funds were taken inappropriately.

Later, after the close of the evidence, the court reminded the jury that "if you should decide that the opinion of an expert is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion of the expert are not sound, or that the opinion is not supported by the evidence, then you may disregard the opinion of any expert totally."

These instructions, although not referring to Barker by name, sufficiently addressed the possibility that the jury would be misled into believing that Barker, rather than the court, was the source of the legal standards applicable to the case. See United States v. Myers, 972 F.2d 1566, 1578 (11th Cir. 1992) (error in admission of expert testimony deemed harmless where court instructed the jury that "it was their 'duty to decide . . . the specific facts' and whether to 'accept . . . [and] rely upon an expert witness'"); United States v. Herring, 955 F.2d 703, 709 (11th Cir. 1992) (any misstatement by expert of relevant legal definition harmless where court "properly instructed the jury . . . as to the weight to be given expert testimony," "nothing indicates that the jury did not abide by the court's instructions," and the court "took adequate steps to protect against the danger that the expert's opinion would be accepted as a legal conclusion"); United States v. Milton, 555 F.2d 1198, 1204 (5th Cir. 1977) (no error in admitting expert

testimony that appeared to be a legal conclusion in light of instructions to the jury to "accord no unusual deference to expert testimony and to take the court's instructions as the sole source of applicable law").

Finally, Defendants do not argue, nor could they persuasively, that the verdict is unsupportable without considering the challenged testimony. Defendants insist that Barker's opinions about the parties' contracts compounded the district court's error in submitting contract interpretation issues to the jury. As explained above, however, we find no error in the district court's refusal to instruct the jury as Defendants wished on that subject. Moreover, having examined the record, we cannot say that the allegedly improper opinions offered by Barker were so numerous or so powerful in their likely impact that we may assume they played a significant role in the jury's verdict. Quite simply, any error associated with the admission of Barker's "legal conclusions" does not warrant setting aside the verdict.[19]

---

[19]Defendants rely primarily on two cases, neither of which is helpful. In <u>Harcros Chemicals</u>, we indicated that testimony by an expert statistician purporting to define the "legal standards applicable to this case" should be excluded on remand. 158 F.3d at 565. Barker's testimony did no such thing. Likewise, in <u>Montgomery v. Aetna Casualty & Surety Co.</u>, 898 F.2d 1537 (11th Cir. 1990), we ruled that the district court should not have allowed an expert to state his opinion regarding the duties created by an insurance contract. We explained that "[a]n expert may not . . . merely tell the jury what result to reach," and "also may not testify to the legal implications of conduct; the court must be the jury's only source of law." <u>Id.</u> at 1541. Barker did not purport to tell the jury how it should interpret the contracts, and certainly did not "merely" offer such an opinion. In any event, in neither <u>Harcros Chemicals</u> nor <u>Montgomery</u> did we have occasion to consider whether the offending testimony was so egregious as to require a

45

F.

Defendants likewise assert that the district court abused its discretion by allowing the Plaintiffs to present testimony from an immigration expert, Dale Schwartz, regarding the passport-stamping practices of Mexican immigration authorities. Various Plaintiffs testified at trial that Virani made several trips to Monterrey for meetings to solicit their investment in the partnerships. Defendants denied those allegations, and produced as an exhibit (not admitted into evidence) a passport which did not reflect any stamps by Mexican immigration authorities showing Virani's entry into Mexico around the dates in question. In response, Schwartz testified regarding the passport-stamping practices of Mexican immigration officials, and opined that a Canadian citizen like Virani is not required to present a passport either to enter Mexico or to return to the United States. Schwartz added that even when a passport is presented, it is not always stamped by Mexican authorities.

Defendants now challenge the district court's denial of their Daubert challenge to Schwartz's testimony. They assert that Schwartz's testimony is not reliable because it is based largely on his personal experience rather than verifiable

new trial. In Harcros Chemicals, we reversed a summary judgment order, and in Montgomery we had already decided that the objecting party was entitled to judgment as a matter of law before we addressed the evidentiary issue.

46

testing or studies. Although <u>Daubert</u> applies to all expert testimony, not just "scientific" testimony, <u>see</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 151, 119 S. Ct. 1167, 1176 (1999), there is no question that an expert may still properly base his testimony on "professional study or personal experience." <u>Id.</u> Defendants' objection is unfounded on this record.

Defendants also contend that Schwartz had no experience with, and considered no studies regarding, the practices of immigration authorities in Monterrey as opposed to Mexico generally. Defendants do not establish sufficient reason to believe that Monterrey officials handle these matters differently than their counterparts elsewhere in the country, however. Nor do Defendants persuasively challenge Schwartz's qualifications to testify regarding Mexico generally. And Schwartz's testimony was consistent with Plaintiff eyewitnesses who placed Virani in Monterrey on or about the dates in question.

Defendants' objections plainly go to the weight and sufficiency of Schwartz's opinions rather than to their admissibility. The district court did not err in permitting Schwartz's expert testimony; and even if it did, Defendants have not come close to showing that the challenged testimony had a "substantial prejudicial effect" entitling them to a new trial. <u>See</u> <u>Alexander</u>, 207 F.3d at 1326.

G.

Defendants argue next that the district court erred by failing to instruct the jury that Plaintiffs should be charged with constructive knowledge of the prices Defendants paid for properties acquired through their land price fraud. As noted above, we review a district court's failure to give a jury instruction only for abuse of discretion. See, e.g., Chirinos, 112 F.3d at 1101. We find no error on this issue.

At trial, Plaintiffs sought damages equivalent to the "excess profits" that Defendants obtained through the land price fraud. Plaintiffs produced evidence showing that, rather than acquiring the desired tracts for the partnerships, Defendants first acquired the tracts themselves at market prices, and then sold them to the partnerships at vastly inflated prices, pocketing the difference. Those extra proceeds would otherwise have remained in the partnerships' accounts and been available for uses benefitting the partners. In an attempt to overcome this evidence, Defendants argue that the Plaintiffs could have and should have discovered for themselves the prices actually paid for the properties. Accordingly, say Defendants, Plaintiffs cannot now argue that they had no knowledge of the alleged fraud, and cannot persuasively assert that they invested or retained their partnership interests in reliance on the belief that no such fraud was occurring. Defendants therefore assert that the district court should have instructed the jury that Plaintiffs had constructive knowledge of the alleged fraud.

48

Defendants' argument is based largely on the contents of certain Georgia public records. As described by the Defendants, Georgia law requires that revenue stamps reflecting the amount of the statutory transfer tax be placed on all warranty deeds exchanged in real estate transactions. The tax paid is $1 for the first $1000 in price and ten cents for each additional $100. Defendants contend that knowing this formula, a reasonable person could use the revenue stamps to compute the amount paid for the properties, and draw whatever inference he may.

Plaintiffs do not dispute that one could conceivably in some circumstances use the stamps placed on a warranty deed to determine a parcel's purchase price. They do not agree, however, that the process would be as easy or reliable as Defendants propose. They emphasize that the face of the deed does not reveal the purchase price; the purchase price may be determined only after number-crunching. They also argue that the process is neither straightforward nor foolproof. Indeed, Defendants' accounting expert -- who certainly is as sophisticated, if not more, on these matters than the individual Plaintiffs -- testified that he did not know how to determine the purchase price of a parcel from the deed. Defendants' real estate expert, although testifying that one could determine purchase price from the deed, acknowledged that not all warranty deeds bear a revenue stamp, and conceded that the process might require further factfinding or

49

independent research; to confirm, for example, whether there was a mortgage on the property.

Georgia cases have applied a public record/constructive knowledge doctrine in connection with real estate transactions. It does not appear, however, that the doctrine has ever been applied where the relevant fact is not stated explicitly on the face of the document (as opposed to requiring further calculations, a measure of deduction, and at least the potential for further research). In Reidling v. Holcomb, 483 S.E.2d 624 (Ga. App. 1997), for example, the court rejected the negligence claim of a purchaser who started construction of a house on the wrong parcel of land. The court found that various public records, including the deed itself, expressly put the purchaser on notice of the proper location of his plot; it therefore reasoned that the purchaser's "failure to exercise ordinary care . . . to avoid the negligence, if any, of [the defendant real estate agency] is so plain, palpable, and indisputable as to bar his recovery as a matter of law." Id. at 626. In Hardage v. Lewis, 405 S.E.2d 732 (Ga. App. 1991), the court rejected the negligence claim of a purchaser who relied on a survey that failed to indicate the existence of an easement. The court found, among other considerations, that the easement was recorded and thus could have been discovered from a review of public documents. Id. at 734. And in Blackburn v. Buchwald, 351 S.E.2d 446, 447 (Ga. 1987), the

plaintiff's claim was barred because the deed representing an alleged fraudulent conveyance had been recorded and thus the transaction could have been discovered. In none of these cases did the court attempt to lay down a broad rule of constructive knowledge, and in none of these cases was any measure of deduction required to discern the relevant information.[20]

Applying the public record constructive/knowledge doctrine here would go beyond existing Georgia law. Moreover, Defendants' proposed instruction is unsupported by the record, which does not establish an adequate foundation for the notion that calculating purchase price based on the contents of the warranty deeds for the particular parcels at issue here would be simple and unequivocal. Finally, although non-residents who seek out and purchase a parcel of Georgia real estate may well have some duty of diligence regarding the affairs of the property in question, here the Defendants -- personally and through their agents -- actively solicited the Plaintiffs in Mexico. Moreover, the Plaintiffs did not actually purchase Georgia real estate; rather, the partnerships purchased the properties. To charge these Plaintiffs with the same constructive knowledge of Georgia's public

---

[20]The only other case cited by the Defendants, Lewis v. Patterson, 12 S.E.2d 593 (Ga. 1940), is likewise inapposite, and provides no support for their argument that it was "reversible error not to . . . charge the jury" in the manner they propose. Indeed, in Lewis the court actually set aside a judgment because the trial judge gave an incorrect and overly broad charge relating to the public record/constructive knowledge doctrine as it related to wills.

51

records expected of someone who independently seeks out and purchases a parcel of real estate in Georgia is unwarranted, at least in these unique circumstances and absent controlling Georgia authority directly on point. The district court did not abuse its discretion by refusing to give a jury instruction regarding Plaintiffs' constructive knowledge of the land price fraud.[21]

## H.

Defendants argue that, for 32 Plaintiffs, the evidence was insufficient to support the jury's implicit finding that the Defendants committed at least two RICO predicate acts proximately causing injury to them. Accordingly, say the Defendants, the district court erred by not entering judgment as a matter of law on these Plaintiffs' RICO claims. We disagree.

Our review of this issue is limited. We ask only "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). Moreover, "[a]ll evidence and inferences are considered in a light most favorable to the nonmoving party. . . . [I]f there is substantial evidence opposed to the motion such that

---

[21]In an alternative argument, Defendants assert that Plaintiffs had constructive knowledge of the prices paid for the tracts because their agent, Abaco, had knowledge of or access to information regarding those prices. As discussed above, there has been no showing that Abaco was as an agent of the Plaintiffs, and there are no grounds for reversal on this basis.

52

reasonable people, in the exercise of impartial judgment, might reach differing

conclusions, then such a motion was due to be denied and the case was properly

submitted to the jury." Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir.

1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).

There is no dispute that, to prove a civil RICO claim based on a violation of

§ 1962(c), a plaintiff must establish that the defendant committed at least two

predicate acts proximately causing the alleged injury to his business or property.

> An act of racketeering [is] commonly referred to as a "predicate act[.]" [See 18 U.S.C. § 1961(1)]. A "pattern" of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14 (1985); Bank of Am. Nat'l Trust & Sav. Ass'n v. Touche Ross & Co., 782 F.2d 966, 971 (11th Cir. 1986).

> Predicate acts are related if they "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" See Sedima, 473 U.S. at 496 n.14. . . .

> Private litigants can recover for racketeering injuries under 18 U.S.C. § 1964(c), but their injury must "flow from the commission of the predicate acts." Sedima, 473 U.S. at 497. This means that a private plaintiff who wants to recover under civil RICO must show some injury flowing from one or more predicate acts. A plaintiff cannot allege merely that an act of racketeering occurred and that he lost money. He must show a causal connection between his injury and a predicate act. If no injury flowed from a particular predicate act, no recovery lies for the commission of that act.

Pelletier v. Zweifel, 921 F.2d 1465, 1496-97 (11th Cir. 1991) (citations omitted).

53

As noted above, Plaintiffs attempted to prove that Defendants committed seven statutory predicate acts affecting each Plaintiff: (1) money laundering, 18 U.S.C. § 1956(a)(1); (2) receiving stolen funds, 18 U.S.C. § 2315; (3) using interstate travel to launder funds, 18 U.S.C. § 1952; (4) transporting funds taken by fraud, 18 U.S.C. § 2314; (5) mail fraud, 18 U.S.C. § 1341; (6) wire fraud, 18 U.S.C. § 1343; and (7) transporting persons to defraud, 18 U.S.C. § 2314. Defendants say that the 32 Plaintiffs either failed to prove the elements of these offenses or failed to show how they were proximately injured by the offenses.

An initial question concerns how we approach this issue on appeal. Defendants suggest that if there is insufficient evidence with respect to even one of the seven predicate acts, we must reverse and enter judgment in their favor because it is possible that the jury relied on that act and only one other in deciding the RICO claim. Defendants observe that the verdict form did not ask the jury to specify which predicate acts were established with respect to which Plaintiff. Plaintiffs counter that when reviewing a decision on a motion for judgment as a matter of law in a civil case, if any one basis for the verdict is valid, the judgment must be affirmed. Accordingly, as they see it, the verdict for the 32 Plaintiffs stands unless Defendants negate the possibility that the jury relied on two valid predicate acts regarding these Plaintiffs. Simply put, they say, Defendants must

54

show the evidence is insufficient with respect to six of the seven acts, rather than just one act.

Plaintiffs' argument is closer to the mark, because courts treat a motion for judgment as a matter of law differently than they do a motion for new trial.  In Richards v. Michelin Tire Corp., 21 F.3d 1048 (11th Cir. 1994), we refused to order a JNOV against a plaintiff on its negligence claim even though we found insufficient evidence regarding one of the plaintiff's theories of negligence.  As we explained:

> [T]he need to discredit one as opposed to all of the claims depends on the type of verdict rendered and the motion made, i.e., whether Appellant is seeking JNOV or a new trial.  King v. Ford Motor Co., 597 F.2d 436, 439 (5th Cir. 1979).  In other words, the fact that Richards lumped his negligent design and negligent failure to warn claims into one cause of action and did the same with his wanton design and wanton failure to warn claims is of no consequence.

> With respect to each cause of action, the jury's verdict was a general verdict.  Because the jury returned a general verdict, to be entitled to JNOV on either the wantonness or negligence cause of action, Appellant must show that Richards failed to make out a case under both his design and warning claims.  Thus, with regard to the JNOV motion, the "two-issue" rule applies.

> However, the "two-issue" rule is inapplicable to a motion for a new trial as Appellant, with respect to each cause of action, need only show that the evidence is insufficient to support either one of Richards' claims to prevail on its motion for a new trial.  [See] Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1099 (11th Cir. 1983) ("[U]nless [plaintiff] can support submission of each theory of liability submitted to the jury, we must remand for a new

55

> trial."). Where, as here, two or more claims are submitted to the jury in a single interrogatory, a new trial may be required if either of the claims was erroneously submitted, as there is no way to be sure that the jury's verdict was not predicated solely on the invalid claim.

21 F.3d at 1054-55 (citations and footnotes omitted).

Here, there is <u>no</u> indication in Defendants' briefs, and we find no indication in the record, that Defendants properly moved for a new trial on the ground that these 32 Plaintiffs failed to prove the existence of two or more predicate acts. Defendants sought entry of judgment in their favor, but did not move for a new trial on this (or any other) basis. Accordingly, because the jury's decision on Plaintiffs' civil RICO claim was tantamount to a general verdict (in that the jury did not break down the particular predicate acts giving rise to liability), Defendants are not entitled to reversal and entry of judgment in their favor unless they totally negate the possibility that the verdict rested on two valid predicate acts; in other words, they must show that the evidence was insufficient to prove six of the seven types of acts alleged by the Plaintiffs.[22]

---

[22]The cases cited by Defendants (which involve primarily criminal, not civil, RICO actions) are unhelpful because in none of them did the court enter judgment for the defendant where it was possible, but not certain, that the verdict rested on two or more valid predicate acts. Compare <u>Brandenburg v. Cureton</u>, 882 F.2d 211, 214 (6th Cir. 1989) (ordering new trial); <u>United States v. Marcello</u>, 876 F.2d 1147, 1153 (5th Cir. 1989) (vacating conviction); <u>United States v. Ruggiero</u>, 726 F.2d 913, 921 (2d Cir. 1984) (entering judgment for defendant where all but one predicate act was insufficient, but ordering new trial for defendant where it was possible that two predicate acts were sufficient). Defendants themselves concede that "[w]hen there is some indication that a RICO verdict rests on two or more legally sufficient predicate acts, then the verdict will stand even if one or more legally insufficient predicate acts had been submitted to

Defendants completely fail to negate the possibility that the verdict in favor of these 32 Plaintiffs rested on sufficient evidence of two or more predicate acts.[23] Defendants contend that four of the alleged predicate acts -- money laundering, receiving stolen funds, using interstate travel to launder funds, and transporting funds taken by fraud -- are not established here because even assuming that Defendants committed these acts (something they do not squarely contest), Plaintiffs suffered no proximate injury as a result. Defendants argue that because these offenses occurred after Plaintiffs had already made their initial investments, the offending conduct did not proximately cause any injury.[24]

We disagree. Defendants cite no case law for their argument other than opinions discussing the proximate injury requirement generally. The absence of

_____

the jury." Appellant's Br. at 32-33. Defendants, of course, could have avoided their present dilemma by requesting a verdict form that would have required the jury to specify which predicate acts were proved by which Plaintiffs. See McCord, 873 F.2d at 1274.

[23]Defendants contend that there is no evidence these 32 Plaintiffs were made to travel in interstate or foreign commerce in connection with the alleged fraud; thus, these 32 Plaintiffs cannot cite that offense as a predicate act. Plaintiffs do not dispute this contention; for the reasons discussed herein, however, the apparent lack of evidence to support this alleged predicate act is ultimately of no moment.

[24]Defendants put it this way: "[T]he basis of Plaintiffs' money laundering claim rests on the transfer of funds AA and Signa received after Plaintiffs made their investments. . . . [But] by that time, Plaintiffs had already made their investment. The same holds true for the predicate act of using interstate travel to launder funds. Likewise, Defendants' receipt of funds that had allegedly been stolen already and their transportation of funds that had allegedly been taken by fraud already were not the proximate cause of any injuries." Appellants' Br. at 23 (emphasis in original).

57

case law for their position is not surprising. By definition, the injury caused by an offense such as money laundering cannot occur until money is received by the perpetrator. Yet Congress has recognized that money laundering and other post-investment offenses may constitute predicate acts causing racketeering injury for which damages may be recovered under § 1964. See 18 U.S.C. § 1961(1)(B).

If Defendants' logic were correct, it would be difficult to imagine how these statutory offenses could ever serve as predicate acts in civil RICO cases. Focusing on the initial decision to invest as the only possible point of injury is misplaced. Here, money was given to the Defendants for a particular purpose (purchasing real estate at arms-length prices, and developing and re-selling the parcels in accordance with the law and the parties' expectations). There is substantial evidence that, rather than using the money for that purpose and retaining any excess contributions for the partnerships' benefit, Defendants engaged in the land price fraud, artificially inflated what the partnerships had to pay for the land, misappropriated funds under the guise of taking expenses and commissions, and then laundered and transported the profits they made by their scheme in order to conceal the existence of those profits from the Plaintiffs and, indeed, induce further contributions. As a consequence, funds that should have remained available to the partnerships for the benefit of their investors were diverted to and secretly retained

58

by the Defendants. Defendants' money laundering and related post-investment offenses injured the Plaintiffs by allowing Defendants to continue to deprive the Plaintiffs of the use and benefit of that portion of Plaintiffs' investment which would have remained in the partnerships' accounts had Defendants not engaged in self-dealing.

Asserting that Plaintiffs suffered no injury because they had already invested some money ignores substantial record evidence demonstrating why the Plaintiff made their investment, their reasonable expectations about the future use of that investment, and the likelihood that they would have discovered the fraud and withdrawn their funds were it not for the money laundering and post-investment offenses. We reiterate that Defendants do not cite any case law rejecting one of these statutory offenses as a predicate act on the theory that the plaintiff did not suffer any injury through the misuse of his funds because some of those funds had already been obtained by the RICO defendant.

In their reply brief, Defendants assert several additional arguments why the post-investment offenses do not suffice to sustain the civil RICO verdict. These arguments were not fairly raised in Defendants' opening brief and therefore we may not consider them. See, e.g., Adler v. Duval County Sch. Bd., 112 F.3d 1475, 1481 (11th Cir. 1997); Braun v. Soldier of Fortune Magazine, 968 F.2d 1110, 1121

n.13 (11th Cir. 1992). In any event, these arguments are both insufficiently developed and unpersuasive.

For example, Defendants suggest that there was no proximate cause because there is no evidence that these 32 Plaintiffs engaged in "due diligence" regarding the status of their investments. But Defendants cite no case adding a "due diligence" requirement to the elements of a civil RICO claim predicated on these acts. Nor is Defendants' argument supported by the record. And Defendants' position is especially flawed in light of the jury's finding of a fiduciary relationship between the Defendants and the Plaintiffs. This court and others have long recognized that where such a relationship exists, any obligation of due diligence may be excused, because the plaintiff is entitled to assume that the fiduciary is protecting his interests. See Durham v. Business Mgmt. Assocs., 847 F.2d 1505, 1510 n.7 (11th Cir. 1988) ("the question of whether appellees in the exercise of due diligence should have discovered the alleged violations . . . requires the trier of fact to consider . . . the presence of a fiduciary relationship"); Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 8 (5th Cir. 1967) ("the presence of a fiduciary relationship . . . bears heavily on the issue of due diligence").

Defendants also try to recast their argument into a challenge to the specific proof of injury offered by these 32 Plaintiffs. But contrary to Defendants'

statement in their reply brief, there has been only a cursory -- and wholly unpersuasive -- effort to "demonstrate[] that" each of "these 32 Plaintiffs did not present any evidence that <u>they</u> were proximately injured" by the post-investment predicate acts. Appellants' Reply Br. at 15 (emphasis in original).[25] Having nevertheless reviewed the record ourselves, we find that there was sufficient evidence of proximate cause to withstand a motion for judgment as a matter of law and sustain the verdict.

As we have explained in prior civil RICO opinions, a wrongful act is "a proximate cause if it is 'a substantial factor in the sequence of responsible causation.'" <u>Cox v. Administrator United States Steel & Carnegie</u>, 17 F.3d 1386, 1399 (11th Cir. 1994); <u>see also</u> <u>Beck</u>, 162 F.3d at 1097 (wrongdoing must have been a "substantial factor" in causing the injury); <u>Brandenburg v. Seidel</u>, 859 F.2d 1179, 1189 (4th Cir. 1988) (stating that the inquiry in determining the existence of proximate cause is "'whether the conduct has been so significant and important a cause that the defendant should be held responsible'"). "'If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to

_____

[25]As noted above, Defendants' opening brief frames the issue only in broad terms, without any reference to the evidence as it pertains to any particular Plaintiff.

the result, since such causes, innumerable, are always present.'" Cox, 17 F.3d at

1399 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41,

at 268 (5th ed. 1984)).  Viewing the record in the light most favorable to the

Plaintiffs, there was ample basis for a reasonable jury to conclude that Defendants'

money laundering and three other post-investment predicate acts were a substantial

factor in perpetuating their scheme and in causing significant injury to these

Plaintiffs.[26]  That conclusion alone is enough to establish that the district court did

not err in rejecting Defendants' motion for judgment as a matter of law.[27]

I.

---

[26]Defendants cite this Court's opinions in Beck and Pelletier.  Neither is helpful.  In Pelletier, we found that the predicate act of bankruptcy fraud did not proximately cause the plaintiff's injury, because the allegedly improper bankruptcy filing actually benefitted the plaintiff.  921 F.2d at 1498 ("we are simply at a loss to understand how a stockholder could be injured when his insolvent company is placed under the protection of Chapter 11").  It can hardly be said that Defendants' money laundering and related offenses benefitted the Plaintiffs.  In Beck, we found no proximate cause -- only "but for" causation -- where the plaintiff made nothing more than generalized allegations that he would not have invested with the Defendants if he had known about their illegal activities.  162 F.3d at 1097.  We emphasized that the plaintiff offered no evidence that a factor in his decision-making was a belief that the company was run legally.  Id.  Here, by contrast, there is sufficient evidence that the Plaintiffs would not have invested initially, retained their investments thereafter, or made additional contributions if they had known of Defendants' misconduct.  For this and other reasons, Beck, like Pelletier, does not entitle Defendants to judgment as a matter of law.

[27]Although we need not reach the issue, we observe in passing that we are unconvinced, viewing the record in the light most favorable to the prevailing parties, by Defendants' arguments that these 32 Plaintiffs did not produce sufficient evidence to establish mail and wire fraud as predicate acts.

Finally, Defendants contend that the district court gave an incorrect instruction on the statute of limitations. We find no reversible error.

Defendants took the position below that some or all of Plaintiffs' claims were barred by RICO's four-year statute of limitations. See McCaleb v. A.O. Smith Corp., 200 F.3d 747, 751 (11th Cir. 2000) (discussing limitations period for civil RICO claims). To that end, Defendants proposed to the district court a jury instruction on the statute of limitations. The instruction indicated that the statute begins to run when a plaintiff discovers or should have discovered not only the alleged injury, but also that the injury was part of the alleged pattern of racketeering. The jury did not find a violation of the statute of limitations.

Shortly before Defendants filed their brief with this Court, the Supreme Court in Rotella v. Wood, 528 U.S. 549, 120 S. Ct. 1075 (2000) ruled that the limitations period for a civil RICO action begins to run when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering. 120 S. Ct. at 1080. Defendants now assert that, under Rotella, Plaintiffs' claims are bared by the statute of limitations, or alternatively we should remand for a new trial during which the jury may be properly instructed.

No remand is warranted on this issue. Because Defendants did not object to the jury instruction they now challenge, we review only for plain error. That standard is extremely difficult to meet, especially with respect to jury instructions in a civil case.

> Plain error review is an extremely stringent form of review. Only in rare cases will a trial court be reversed for plain error. . . . We have interpreted the . . . test strictly in the context of erroneous jury instructions . . . . [R]eversal for plain error in the jury instructions or verdict form will occur only in exceptional cases where the error is so fundamental as to result in a miscarriage of justice. To meet this stringent standard, a party must prove that the challenged instruction was an incorrect statement of the law and [that] it was probably responsible for an incorrect verdict, leading to substantial injustice. This element is satisfied if a party proves that the instruction will mislead the jury or leave the jury to speculate as to an essential point of law. In other words, the error of law must be so prejudicial as to have affected the outcome of the proceedings.

Farley v. Nationwide Mut. Ins. Co, 197 F.3d 1322, 1329-30 (11th Cir. 1999) (citations and internal quotation marks omitted).

Defendants fail to show that this is an "exceptional" civil case warranting relief on appeal. To begin with, having requested the (incorrect) instruction given by the district court, Defendants cannot now seek reversal on that basis. In Wood v. President & Trustees of Spring Hill College, 978 F.2d 1214 (11th Cir. 1992), we found no plain error where the appellant's requested instructions mirrored the very instruction that she sought to challenge on appeal. We observed that "[f]ederal

courts generally will not find that a particular instruction constitutes plain error if the objecting party invited the alleged error by requesting the substance of the instruction given." Id. at 1223 (citing Equal Employment Opportunity Comm'n v. Mike Smith Pontiac GMC, Inc., 896 F.2d 524, 528 (11th Cir. 1990) and Crockett v. Uniroyal, Inc., 772 F.2d 1524, 1530 n.4 (11th Cir. 1985)).

Defendants contend that this "invited error" rule is inapplicable where the instruction is rendered incorrect by an intervening change in the governing law. They say that Rotella constitutes such a change in the law. The problem, however, is that Defendants had reasonable grounds for declining to propose -- and, if necessary, stating an objection to -- the "injury and pattern" instruction that instead they asked the court to give. Although a panel of the Eleventh Circuit had endorsed the "injury and pattern" approach, other Circuits had taken a contrary view. Accordingly, at a minimum Defendants could have left it to the Plaintiffs or the district court to propose the "injury and pattern" instruction, and then in good faith asserted an objection to it with an eye toward arguing for a more favorable standard before this Court on en banc review or before the Supreme Court on a petition for certiorari. We therefore do not view this case as an appropriate one to carve out an exception to the invited error rule. See United States v. Tandon, 111 F.3d 482, 489 (6th Cir. 1997) (applying invited error rule where in light of Circuit

65

split the appellant "invited the error when requesting the instruction because, at the time of his trial, an objection to a[n] instruction like the one he had requested would not necessarily have been futile").

In addition, Defendants have not met their heavy burden of showing that the district court's instruction was "probably responsible for an incorrect verdict." Farley, 197 F.3d at 1330. Plaintiffs fairly assert that the parties' statute of limitations arguments focused primarily on the question of injury, not pattern, with Defendants claiming that Plaintiffs should have been aware more than four years prior to filing suit on June 17, 1997 of the facts supporting their allegations that Defendants pilfered their funds in the land price fraud and continued to misuse those funds thereafter. Moreover, Plaintiffs observe that the jury rejected Defendants' statute of limitations argument with respect to the fraud and breach of fiduciary duty claims, even though those causes of action have similar four-year limitations periods and do not have a pattern requirement. Defendants offer no persuasive rejoinder to these points, other than to stress that we cannot be certain today how the jury would have ruled if a proper instruction had been given. That is true insofar as it goes, but the plain error standard requires a much stronger showing of uncertainty, and Defendants fail to establish that the incorrect instruction probably caused the jury to decide the statute of limitations issue

66

differently than it otherwise would have. We conclude, in short, that there was no reversible error on this issue.

For all of the foregoing reasons, we affirm the district court's entry of judgment in Plaintiffs' favor.

**AFFIRMED.**