**Barbara Ann BRANDENBURG, Plaintiff–Appellee,**

v.

**Harry E. CURETON, Lynn Murphy, Calvin Morton, Jr., Defendants,**

**Appeal of Warren G. HATFIELD, Roy Sharp and Mark Wright, Defendants–Appellants.**

No. 87–6371.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 15, 1988.

Decided Aug. 11, 1989.

---

Robert H. Watson, Jr., Watson & Emert, Knoxville, Tenn., John C. Duffy (argued), Watson, Reeves & Beeler, Knoxville, Tenn., for defendants-appellants.

John K. Harber (argued), Pryor, Flynn & Priest, Knoxville, Tenn., for plaintiff-appellee.

Before: NELSON and BOGGS, Circuit Judges; and ENSLEN, District Judge.[*]

BOGGS, Circuit Judge.

Sgt. Butch Hatfield, Deputy Mark Wright, and Detective Roy Sharp appeal the judgment entered against them for $75,000 in compensatory damages for a violation of the constitutional rights of plaintiff Barbara Ann Brandenburg and her deceased husband Dallas Brandenburg. Since the jury was presented with an impermissible theory of recovery, we reverse the judgment. We order a new trial as to the claim against detective Roy Sharp because we believe that there are material factual issues yet to be determined regarding plaintiff's claim that Sharp violated the constitutional rights of Dallas Brandenburg when he killed him while attempting to serve a peace warrant.

## I

Dallas Brandenburg and his wife, Barbara, owned a mobile home located on thirty acres of land in Campbell County, Tennessee. In December 1983, the Brandenburgs sold their mobile home to Karen and Billy Collette and gave the Collettes permission to remain on their land for one year. The Collettes were persistently late in making their monthly payments, and the Brandenburgs traveled from Florida to Campbell County to discuss this problem with the Collettes. On June 7, 1984, the Brandenburgs arrived at their property and allegedly discovered that the Collettes had been abusing the property, specifically, that they had damaged the mobile home and burned a portion of a log home kit that the Brandenburgs had stored on the property. At this time, Dallas Brandenburg requested that the Collettes get off the property, but the Collettes refused to go.

On June 8, 1984, the Brandenburgs went to the Campbell County Courthouse for the purpose of instituting a detainer action against the Collettes. While at the Courthouse, the Brandenburgs saw the Collettes and overheard them attempting to obtain a peace warrant against Dallas Brandenburg to prevent him from going to the Collettes' residence. Mrs. Brandenburg contends that they did not know at that time if the Collettes obtained a peace warrant.

The Brandenburgs were unsuccessful in their efforts to institute a detainer action against the Collettes, and the next day, June 9, Mrs. Brandenburg claims that they went to their property in order to pack and return to Florida. At approximately the same time, defendants Sharp, Hatfield, and Wright met near the Brandenburg property to prepare to serve on Dallas Brandenburg a peace warrant that had been issued the previous day. Apparently there was no specific preparation for serving the warrant regarding who was in charge or what

[*] The Honorable Richard A. Enslen, United States District Judge for the Western District of Michigan, sitting by designation.

procedure would be used. Defendants assert that it was routine for Hatfield to be in charge of talking with the suspect. Defendants had been warned by the Collettes that there "might be trouble" in serving the warrant, but the defendants all agreed that this was a common concern of those who obtained peace warrants.

The defendants left for the Brandenburg property in two cars, one clearly marked as a police vehicle, the other unmarked. The unmarked car was in the lead. Detective Sharp, dressed in plain clothes in the unmarked car, arrived first, but the other car was close behind. The two cars entered the property through a gate, went up a road and stopped about 125 yards from where the Brandenburgs were loading their truck. The defendant officers immediately got out of their vehicles, each holding a shotgun. At this point, Dallas Brandenburg retrieved his rifle from the back of his truck. There is some disagreement about when the Brandenburgs first became aware that the defendants were law enforcement officers. Barbara Ann Brandenburg testified that she only noticed the lead man, who was dressed in plain clothes, and that when they initially got out of the cars, all of the officers spoke at once. It is clear that the Brandenburgs realized that they were dealing with law enforcement officers when Officer Hatfield advised the Brandenburgs over the patrol car's loudspeaker who he was and that he was there to serve the peace warrant. At this time, Dallas Brandenburg fired six shots, at least the first two (but perhaps all) into the air, and told the officers to leave his property or they would be killed. Hatfield asked Mr. Brandenburg if they could pull up and use the turn around in order to exit, and Brandenburg refused this request. The officers then began to back out of the driveway, although Sharp initially could not start his car. At this same time, Mr. Brandenburg got in his truck to follow the officers.

Subsequently, both police vehicles backed out past the fence, and the officers parked their cars and again got out with shotguns in hand. By the time Mr. Brandenburg drove his truck to a point just inside the fence, the officers were crouched between the two police vehicles. Sharp testified that Mr. Brandenburg got out of his truck, "stepped around to the gate, laid the rifle down right before he got to the gate," and then closed the gate. The officers began instructing him to submit to their peace warrant and not to pick up his rifle. Apparently, Brandenburg moved to pick up his rifle when officer Hatfield fired a warning shot. Brandenburg then picked up his rifle, and at this time, Sharp fired his weapon and killed Brandenburg.

Dr. Cleland Blake, a board-certified pathologist, examined the body and testified that when the fatal bullet entered Mr. Brandenburg's body, his left arm was extended but his right hand was not in a grasping position.

Plaintiff Barbara Ann Brandenburg sued under 42 U.S.C. § 1983, alleging violations of her constitutional rights and those of her deceased husband. At the conclusion of plaintiff's proof at a jury trial, the judge directed a verdict in favor of two other defendants, but refused to direct a verdict for Sharp, Wright, or Hatfield and allowed the claims against them to go to the jury. On November 5, 1987, the jury returned a verdict against the remaining defendants, jointly and severally, for $75,000. Defendants appeal the trial court's refusal to grant a directed verdict or judgment notwithstanding the verdict.

## II

When judging whether a trial court correctly granted or denied a motion for a directed verdict, an appellate court is to determine "whether without weighing the credibility of the witnesses or considering the weight of the evidence, there is substantial evidence from which the jury could find in favor of the party against whom the motion is made." *Bellamy v. Bradley*, 729 F.2d 416, 418 (6th Cir.1984).

Appellants contend that the verdict should be vacated and the case dismissed because the jury based its verdict on an impermissible theory of law, and when this theory is removed, there is no set of facts under which the jury can find a constitu-

tional violation. Alternatively, appellants claim they are immune from suit. We explore each of these contentions in turn.

### A

■ When two claims have been submitted to a jury and one of them should not have been submitted, a general verdict in favor of the plaintiff cannot stand, since it is impossible to know whether the jury based its decision on the improper theory. *United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *O'Neill v. Krzeminski*, 839 F.2d 9, 12 (2nd Cir.1988). However, if it is clear that only the correct theory of recovery was relied upon by the jury, the judgment can stand. *Ibid.*

Appellants argue that the plaintiff's counsel's closing argument assailing the poor procedural preparation of the law enforcement officers, coupled with the introduction of evidence concerning those procedures, put an improper theory of "negligent" deprivation of constitutional rights before the jury and did so in such a way that it is impossible to know if this was the theory upon which the jury based its decision. We agree.

■ We first note that the claim based upon the poor tactical preparation of the law enforcement officers should not have been submitted to the jury. This court has held that outrageous cases of "gross" negligence may give rise to a claim for deprivation of constitutional rights under 42 U.S.C. § 1983, while mere negligence cannot. *See Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277, 283 (6th Cir.1987) (en banc); *see also Jones v. Sherrill*, 827 F.2d 1102, 1106 (6th Cir.1987). On the view of the evidence most favorable to plaintiff, the behavior of the law enforcement officers preparing to serve the warrant could not possibly rise above mere negligence. The preparation for the arrest was not done "with disregard to a known risk or a risk so obvious that

[they] must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow." *Nishiyama*, 814 F.2d at 282. At the most, plaintiff has shown that the law enforcement officers did not consider all of the alternatives available to them.[1]

■ Furthermore, the impermissible claim was presented in such a way that it is not clear which theory of recovery the jury relied upon. Much of the evidence presented at trial concerned the behavior of the officers well before arriving at the Brandenburg property. This evidence included the lack of discussion about how the officers would serve the warrant and the loading of weapons before serving the warrant. Plaintiff's attorney referred to all of this evidence in closing argument, telling the jury that one of the issues for its consideration was whether defendants' failure to follow proper procedures resulted in the deterioration of the situation that led to Mr. Brandenburg's death. Also, the trial judge did nothing to limit or separate this theory of recovery from any other even though an objection was made by plaintiff. Therefore, the verdict cannot stand.

### B

It remains to be determined whether a new trial is warranted. The appellants contend that no reasonable trier of fact could find that they committed a violation of 42 U.S.C. § 1983 either in preparation for serving the peace warrant or at any other time, therefore negating the need for a new trial. Appellants Hatfield and Wright specifically contend that if there can be no recovery based on preparation to serve the arrest warrant, there can be no recovery at all against them, since they did not shoot or assist in the fatal shooting of Brandenburg. Appellant Sharp contends that there are no facts that would demonstrate that his shooting of Brandenburg violated Brandenburg's constitutional rights.

---

**1.** Since we determine that the level of negligence in the officers' preparation is not enough to implicate 42 U.S.C. § 1983 liability, we need not consider whether Brandenburg's death was also too remote a consequence of the officers' preparation to maintain liability. *See Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980).

■ We agree with the appellants Hatfield and Wright that they should be dismissed completely from this action. It is clear that they did not violate Brandenburg's constitutional rights. Most of appellee's evidence linking Hatfield and Wright to the shooting went to the issue of negligent preparation which, as discussed above, cannot be the basis of recovery under 42 U.S.C. § 1983. Furthermore, appellee's attempts to tie appellants Hatfield and Wright to a possible "seizure" "when the defendants drove on to [the] property" or "when the defendants blockaded his departure at the gate of [the] property" are unpersuasive.

A necessary element for recovery in a civil rights action brought pursuant to 42 U.S.C. § 1983 for illegal seizure is the use of "unreasonable force." *Cameron v. City of Pontiac, Mich.*, 813 F.2d 782, 784 (6th Cir.1987) (citing *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). This court can find no evidence in the record which would lead it to conclude that a reasonable person could determine that appellants Hatfield and Wright as peace officers acted unreasonably either by pulling onto the property or attempting to remain on or near the property in order to serve a valid peace warrant.

■ As to detective Sharp, if he is correct that the evidence concerning the shooting can only be interpreted to show that he acted reasonably, *Cameron* decrees that there is no issue for the jury. The use of deadly force is reasonable if an officer believes that there is a threat of serious physical harm to the officer or others. *See Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir.1985).

Though detective Sharp claims that Mr. Brandenburg had pointed his weapon "directly at us," presumably proving that he or any officer would have a subjective belief in a threat of serious physical harm, there are facts which might indicate otherwise. Appellants' own expert testified that the position of the body after death indicated that the right hand was not grasping the trigger and that the position of the left arm could not prove that Mr. Brandenburg was aiming his weapon at the officers. Furthermore, the jury might reasonably consider why the two other officers did not fire shots if it was quite obvious that they were being threatened with imminent bodily harm.

Although this court intimates no view regarding the weight of the evidence, we recognize that a reasonable person might believe that detective Sharp acted unreasonably in firing the shot that killed Mr. Brandenburg.

### C

■ Sharp also asserts that there should not be a new trial because of his claim of qualified immunity. This court determines that there is a factual question for the jury concerning the shooting, and that therefore the facts of this case do not necessarily support appellant Sharp's argument that he is immune from suit.

Government officials performing discretionary functions have a qualified immunity shielding them from liability for damages as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 637–39, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). In other words, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* 107 S.Ct. at 3039. This circuit has noted that the question is whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir.1987). Although this is purely a legal question to be decided by the court, *Donta v. Hooper*, 774 F.2d 716 (6th Cir.1985), a court may not be able to make a determination if the exact character of the "actions" that *Anderson* requires the court to consider is unknown. *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir.1988).

This court ultimately decides the law to be applied. In this case, however, the jury

becomes the final arbiter of appellant Sharp's claim of immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury. If the jury determines that Sharp fired on Brandenburg without a belief that someone was in danger of serious bodily injury, then as a legal matter no reasonable officer could believe that such gunfire would not violate another's constitutional rights. On the other hand, if the jury believes detective Sharp's version of the facts, he will be entitled to qualified immunity.

The judgment is VACATED and the case REMANDED for a new trial consistent with this opinion.