961 F.2d 1578
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph E. SENK, et al., Plaintiffs-Appellees,
v.
VILLAGE OF NORTHFIELD, et al., Defendants-Appellants.
 No. 91-3823.
 United States Court of Appeals, Sixth Circuit.
 April 22, 1992.
 
 Before RALPH B. GUY, Jr. and DAVID A. NELSON, Circuit Judges, and REAVLEY, Senior Judge.*
 PER CURIAM.
 
 
 1
 This is a civil rights action that was brought in federal court by a husband and wife who alleged, among other things, that excessive force was used in arresting the husband after his participation in a violent domestic altercation. The plaintiffs also claimed that their constitutional rights were violated by a search of their house conducted by one of the defendants after the arrest.
 
 
 2
 Asserting qualified immunity, six defendants, all of them police officers, moved for summary judgment. The district court denied the motion, and the officers perfected a timely interlocutory appeal. The principal question on appeal is whether the court erred in concluding that there were genuine issues of material fact that precluded summary disposition of the claims against the officers.
 
 
 3
 Concluding that the district court was correct, in the main, we shall affirm the denial of summary judgment as to the officers (five in number) who are alleged to have used excessive force. We believe that the officer who conducted the challenged search was entitled to qualified immunity, however, and we shall direct that judgment be entered in his favor on remand.
 
 
 4
 * Plaintiff Joseph Senk, who is said to have suffered from post-concussion syndrome, had an explosive outburst in which he trashed his kitchen and attacked his wife. Defendant Ronald Dalzell, a police officer employed by the Village of Northfield, Ohio, was dispatched to the Senk residence in response to a 911 telephone call. Officer Dalzell requested assistance from the Sagamore Hills police department, and Officer David Calhoun, another defendant, responded to this request.
 
 
 5
 The two policemen arrived at the Senk residence at about the same time. Mr. Senk told Officer Calhoun that he and his wife had been fighting and that he had been drinking. The officers found that Mrs. Senk had red marks on her neck and chin, indicating that she had been grabbed around the neck. Mrs. Senk told the officers that her husband had beaten her in the chest and abdomen, that he had attempted to choke her, and that she was having trouble breathing, had abdominal pains, and could taste blood in her mouth. She allegedly warned the officers that Mr. Senk was violent and would attempt to hurt them if placed under arrest.
 
 
 6
 The officers summoned a rescue squad for Mrs. Senk, and Officer Calhoun escorted Mr. Senk to a patrol car. The parties disagree as to whether Mr. Senk was handcuffed at this time, but it is undisputed that he offered no resistance. Meanwhile, a Sagamore Hills police dispatcher sent Officers Christine Calhoun (the wife of David Calhoun), Philip Rinehardt, and Kevin May to the scene. These individuals too have been named as defendants.
 
 
 7
 Mrs. Senk says that she asked an emergency medical technician to call her oldest daughter and tell the daughter to pick up two other children. The technician was given permission to use the telephone in the house for that purpose, according to Mrs. Senk, but the officers say that she gave them permission to enter the house. Both sides agree that Officer David Calhoun and Office Dalzell entered the Senk residence to make the call. Inside, Calhoun observed that a kitchen cabinet had been tipped over and its contents scattered about the floor.
 
 
 8
 Officer Dalzell asked Mrs. Senk if she wanted to press charges against her husband. She said she did. Officer Dalzell then went to the patrol car to inform Mr. Senk that he was going to be taken into custody for domestic violence. Officers Christine Calhoun, Rinehardt, and May arrived shortly thereafter.
 
 
 9
 The parties' accounts of what happened next differ sharply. Officer Dalzell says that when he informed Mr. Senk, who was still sitting in the police car, that he was under arrest for domestic violence, Senk responded that "I had better draw my fucking gun and shoot him, it was the only way I was going to stop him from killing me." The Senks' version is that Mr. Senk was screaming at the officers for entering his house, and Officer Dalzell stuck his head inside the front door of the cruiser to tell him to "shut his fucking mouth." Whatever may have been said, both sides agree that Mr. Senk kicked out the side window of the police car after the exchange with Officer Dalzell.
 
 
 10
 Officers Dalzell and David Calhoun say that Mr. Senk then reached out of the broken window and threatened to take Officer Calhoun's gun and shoot him. Mr. Senk allegedly grabbed the officer's gun belt. Officer Calhoun says he responded by striking Mr. Senk across the forearm with his flashlight, causing him to release his grip on the gun belt, and pushed him back into the vehicle. Mr. Senk then allegedly grabbed Officer Dalzell's gunbelt, and Dalzell freed himself by punching Mr. Senk in the face.
 
 
 11
 Mr. Senk attempted to force his way through the broken window at this point, according to Officer Calhoun. All of the officers then on the scene attempted to push him back into the car, but they could not do so. The officers say that they tried unsuccessfully to handcuff Mr. Senk as he was coming out the window, and Mr. Senk fell out the window face-first onto the ground. Once outside the car, Mr. Senk kicked and thrashed about until he was subdued.
 
 
 12
 Mr. Senk, for his part, denies that he threatened the life of any officer, or grabbed an officer's gun belt, or assaulted an officer. He points to deposition testimony given by a neighbor, Paul Testa, who said that after Mr. Senk kicked out the car window, Officer David Calhoun yelled "Goddamn it Joe, you really fucked up now, this is a brand new cruiser." Mr. Testa testified that Officer Calhoun immediately struck Mr. Senk on the head three times in rapid succession "with a big damn flashlight." Mr. Testa said he did not hear Mr. Senk threaten to kill a police officer and did not see Mr. Senk try to grab an officer's gun or gun belt. He did see Mr. Senk reach his hands out the window, but his impression was that Mr. Senk was merely trying to protect himself from Officer Calhoun.
 
 
 13
 Mr. Testa recalls that one of the officers then opened the car door, and Mr. Senk, dazed, stepped out. As he stood on the ground, all of the officers who were on the scene began to beat him with their fists. The officers then "literally kicked [Senk's] feet out from underneath him." At this point, with Mr. Senk handcuffed and on the ground, Officer Christine Calhoun, who weighed about 200 pounds, leaped on him. According to Michael Lucas, another witness, Mrs. Calhoun "was either bouncing on him or applying some type of pressure to him that seemed unnecessary." Lucas said she had Senk by the throat, and Testa said that her nightstick was pressed against his throat, choking him.
 
 
 14
 Mr. Senk was taken to a hospital by ambulance. He suffered a respiratory arrest and allegedly lay in a coma for five weeks. He had trauma to the head, a dislocated elbow, and multiple bruises and lacerations to the head, face, and arms. It is alleged that he lost his sight and suffered brain damage as a result of the beating by the police.
 
 
 15
 Defendant Larry Felean, another policeman, arrived at the scene shortly after Mr. Senk was finally restrained. Officer Dalzell told Felean that there had been domestic violence at the Senk house and asked him to go back to the police station, get a camera, and take pictures of the inside of the residence. Officer Felean did so, and also examined some papers inside the house.
 
 
 16
 The Senks brought suit under 42 U.S.C. § 1983 against the Village of Northfield, the Township of Sagamore Hills, the individual police officers, and three emergency medical technicians. Asserting qualified immunity defenses, the police officers moved for summary judgment. The district court denied the motion, and this appeal followed.
 
 II
 
 17
 The defendants contend that Mr. Senk posed an immediate threat to the safety of the officers, that they used only moderate force against him, and that their behavior was objectively reasonable under the circumstances. Graham v. Connor, 490 U.S. 386, 396 (1989). Given the sharp conflict in the evidence, only a jury can decide whether the facts are as the officers say they are.
 
 
 18
 In Yates v. City of Cleveland, 941 F.2d 444 (6th Cir.1991), we held that the standard for determining qualified immunity in excessive force cases is the general standard set out in Anderson v. Creighton, 483 U.S. 635 (1987): "whether an objectively reasonable officer" would believe that the conduct in question was lawful. Yates, 941 F.2d at 445-47. If the level of force used by the officers was necessary to remove a threat to their safety, for example, or was necessary to avoid the use of lethal force, a grant of qualified immunity would be appropriate. See Russo v. City of Cincinnati, 953 F.2d 1036, 1044-45 (6th Cir.1992); Brandenburg v. Cureton, 882 F.2d 211, 215 (6th Cir.1989). Immunity would doubtless be appropriate here if it were undisputed that the facts were as claimed by the officers. If the Senks' version of the facts is correct, however, the officers who are accused of using excessive force would clearly not be entitled to qualified immunity. In this case, as in Brandenburg, 882 F.2d at 216, "the legal question of qualified immunity is completely dependent upon which view of the facts is accepted by the jury." Summary judgment based on qualified immunity is therefore inappropriate. Yates, 941 F.2d at 447.
 
 
 19
 It is contended on behalf of Officers May and Rinehardt that they are entitled to summary judgment because the Senks' brief opposing the summary judgment motion presented no specifics detailing their participation in the alleged beating. Witness Lucas stated that five or six officers wrestled Mr. Senk to the ground, however, and that there were at least five officers on top of Mr. Senk when Christine Calhoun choked him. Only five officers were present at the time, and Officers May and Rinehardt were among that number; Mr. Lucas' statement thus raises an issue of fact as to whether they participated in illegal conduct. See Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir.1986).
 
 
 20
 It is contended on behalf of Officer Christine Calhoun that there was no evidence that she used unreasonable force in employing her nightstick to restrain Mr. Senk. The testimony given by Mr. Testa could well support the plaintiffs' claim, however, and the statement of Mr. Lucas seems clearly to do so. Summary judgment would not be appropriate for this defendant.
 
 III
 
 21
 As to the contention that Officer Felean conducted an unconstitutional search of the Senks' house, it is undisputed that no search warrant was obtained. Officer Felean testified, however, that he operated under the assumption that Officer Dalzell, his senior officer, had obtained Mrs. Senk's consent to the search. Such an assumption was objectively reasonable, in our opinion.
 
 
 22
 Mrs. Senk had unquestionably been the victim of a serious assault by her husband, and she had agreed to press criminal charges against him. Officer Felean was told by his superior that violence had taken place inside the house and that he should take pictures for evidentiary purposes. He had no reason at all to suppose that Mrs. Senk had not agreed to the gathering of evidence to support the charges she said she wanted to bring. On remand, therefore, summary judgment should be entered in favor of Officer Felean.
 
 
 23
 AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.
 
 
 24
 REAVLEY, Circuit Judge, concurring in part and dissenting in part.
 
 
 25
 I would affirm the judgment of the district court. Without consent to search, a fact issue about which there is a square conflict, the officers had no right to search. It would be the same if Officer Dalzell erroneously told Officer Felean that a warrant had been issued.
 
 
 
 *
 The Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth Circuit, sitting by designation