**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0278n.06

Case No. 19-1801

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

DAVID ISIAH HENRY and HEATHER WILLIAMS,

    Plaintiffs-Appellants,

v.

CITY OF FLINT, MICHIGAN, MICHAEL HENIGE, SEAN COE, and NIKOLAS WHITE,

    Defendants-Appellees.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

</td></tr>
</table>

**FILED**
May 18, 2020
DEBORAH S. HUNT, Clerk

BEFORE: COLE, Chief Judge; and BOGGS and SUTTON, Circuit Judges.

BOGGS, Circuit Judge. In November 2016, at 1:30 in the morning, Flint Police officers, acting properly, went to a house to see if a person wanted on a warrant might be there. A next-door neighbor, David Henry, apparently concerned and/or annoyed by the appearance of unknown persons and lights outside the house next to his, came out onto his porch. The ensuing conversation with the police officers, which was captured on Henry's relatively clear cell-phone recording, moved from straightforward to belligerent to, ultimately, Henry's being arrested, pepper-sprayed, and handcuffed. All charges were ultimately dropped. Although Emily Post or Miss Manners would never have approved of the conduct of either Henry or the police, that is irrelevant.

The legal question before us turns, with regard to Henry's false-arrest claim, on only one issue. Could any reasonable officer have thought Henry violated City of Flint Code of Ordinance § 31-12 (Disorderly Conduct and Disorderly Persons)? Answering that question, in turn, depends

1

on another: Did a neighbor turn on a light in his house? If so, a reasonable officer standing in the shoes of the Flint police might have had probable cause to think the ordinance had been violated, and thus qualified immunity would attach. If not, then no reasonable officer could have thought that arresting Henry was constitutional. Because this fact question was not captured on video and is disputed in the evidence, we reverse and remand for a jury to make that determination.

## I.  Facts

On November 23, 2016, Flint police officers Michael Henige and Sean Coe were patrolling the Columbia Heights neighborhood late at night. They spotted a "well-known prostitute" soliciting passersby. After arresting her on an outstanding warrant, they discovered she had the ID card of her "similar" looking sister, also a fugitive from justice. The woman said her sister could be found in an abandoned house on Colorado Avenue.

The officers headed to the address. They met Officer White, who had responded to their felon-arrest call. The three officers looked around the outside of the abandoned house with flashlights. Nobody seemed to be there. The lights caught the attention of the owner of a neighboring property, David Henry, who came outside to check things out. Using his cellphone, Henry audio recorded what followed. Because the case will be remanded for further proceedings and because it is difficult to summarize what happened next without inadvertently putting a thumb on the scale for either plaintiff Henry or the defendant officers, we quote extensively from the transcript (which we render verbatim) in narrating what happened next.

Speaking either to himself or someone behind him, Henry said, "I don't know why they all flashing up in my yard and stuff." He then addressed the officers, with each speaking at a relatively normal conversational volume:

> **Henry**: Why you all up in the yard and stuff?
> **Officer Henige**: What's up?
> **Henry:** Why you all up in my yard flashing the lights everywhere?
> **Officer Henige**: This is not your yard. This - Do you own this house? That's not your yard.
> **Henry:** Somebody was just on the side over there.
> **Officer Henige**: That's the back yard of that house.
> **Henry**: Okay, but I just – I [crosstalk] I seen lights on – I seen lights on the side of my house.
> **Officer Henige**: Well, it's a light.
>
> **Unknown Officer**: What's going on?
> **Officer Henige**: He told me we were on his property. I said do you own that house? No, no he doesn't.

It is clear from the tape that the tone of this conversation had already become somewhat antagonistic. Now the exchange deteriorated:

> **Henry:** You ain't gotta be a asshole. I just asked a question.
> **Officer Henige**: You asked it like an asshole, man.
> **Henry**: I ain't asked like an asshole. I asked what you was doing on the side of my house.
> **Officer Henige:** Is that any of your business right now?
> **Henry:** Yeah, it is my business.
> **Officer Henige:** Tell me how?
> **Henry:** But it is my business.
>
> **Officer Coe:** If it's your business, come over here, man; we'll talk.
> **Henry:** No, I ain't gotta come over there. You can take your smart butt on, too.
> **Officer Coe:** So it's not your business.
> **Henry:** It *is* my business. When – when I see strange – when I see strange lights on the side of my house, it is my business
> **Officer Coe**: I think we just got a new project house.

According to Officer White, Coe's statement meant that the police would mentally flag his house for problems in the future.

> **Henry:** You got a new project house? Really. Don't come on my property.
> **Officer White**: I'm just asking you a question.
> **Henry:** What?
> **Officer White**: So, I understand your concerns, bro.

**Henry**: Yeah – no, I just asked him a simple question on why, why is lights on the side of my house, and he want to be an asshole.

**Officer White**: Okay, I'm not being an asshole.

**Henry**: I know you're not, but both of them, talking about he gonna make my house a new project? You gonna run up and find out who I am downtown and stuff. Make my house a project!

**Officer Coe**: Why don't you just come over here, and we'll talk about it.

**Henry**: You know something, I got freedom of speech. I can walk anywhere I want to. I haven't committed no crime. You the one being out of control.

At this point the voices of both Henry and the officers had become more elevated though, as Henry was closer to his phone, his voice is louder on the recording.

**Officer White**: Hey, hey.

**Officer Coe**: Come over here, and we'll talk.

**Henry:** What's that?

**Officer White**: Can we just explain to you…

**Henry**: Mm-hmm.

**Officer White**: We're trying to explain to you what – what the issue was, okay?

**Henry:** Okay.

**Officer White**: You're in an area where there's quite a few abandoned houses.

**Henry:** Okay.

**Officer White**: And it's kind of annoying, when like, people are breaking in…

**Henry**: Well like I said, I seen lights on the side of my house, so I came out to see – this asshole wanna talk shit.

**Officer White**: Hold on, hold on. Listen – listen, the issue wasn't – wasn't that we were shining our light…

**Henry**: He ain't have to be rude, though. He was being rude. Flat-out, point-blank, he was being rude. And that's unbecoming of him of being an officer. He's a plain-out rude person.

**Officer White**: So I'm not going to be able to explain anything to you tonight, sir… Huh? … Alright?

**Henry**: You know something, you can get in your vehicle, cuz I can see you trying to be a asshole too, sarcastically.

**Officer Coe:** You think he's an asshole because he's an officer?

**Henry:** You are.

**Officer Coe:** Then come here man, we'll talk man to man.

**Henry:** You come over here.

**Officer Coe:** Do I have permission to come on your property?

**Henry:** No you fucking don't, so get the fuck on!

**Officer Coe:** I can stay right here all night.

**Henry:** Stay. Dumbass.

4

> **Officer Coe:** Sounds good.
> **Henry:** Motherfucker. You ain't gonna – what you gonna do to me. I ain't committed no crime. Cite a crime I committed. Cite a crime I committed.
> **Officer Coe:** What?
> **Henry:** Cite a crime I committed.
> **Officer Coe:** C'mon…. C'mon.
> **Henry:** What crime have I committed… You come on. You the one threatening me.
> **Officer Coe:** That's okay.
> **[Unidentified female police officer speaking into radio.]**
> **Henry:** Don't worry about it.
> **Officer Coe:** I'm just worried about you bothering the neighbors.

At or just before this point, Officer Coe claims that a neighbor's light turned on. But Henry, on the other hand, argues that a light did not come on and points to Officer White's statement in his deposition that, "I didn't see any lights."

> **Henry**: Fuck you! Ain't – man – ain't no – nobody bothering nobody… Y'all are the ones bothering people, you punk motherfucker.
> **Officer Coe:** Okay. You done?"
> **Henry:** Are *you* done?
> **Officer Coe:** I'm done.
> **Henry:** Well get the fuck on then, bitch. [Crosstalk.] Fuck you… and your damn job, motherfucker.
> **Officer Coe:** Okay.
> **Henry:** What you - Make my house a project. I want you – you want to make my house a special project? Bring it on.
> **Officer Coe:** Okay.
> **Henry:** Bring it on, bring—
> **Officer Coe:** Okay.
> **Henry:** Then you gonna find out who I am.
> **Officer Coe:** Okay. Is that a threat?
> **Henry**: Yeah! That's a - that's a promise it's a threat! That's a promise that it's a threat because I ain't did no crime… I haven't committed no crime.

At this point, Henry turned to reenter his house. As he began to walk toward it, the police moved to arrest Henry.[1] A struggle ensued. One of the officers told Henry to "put your hands behind your back" and to "come here," all without success. Both Henry and his girlfriend can be heard shouting protests and claiming he had not committed any crime. As the group reached Henry's porch, Officer Coe used pepper spray, and the officers took Henry to the ground. As they secured him, police informed Henry that he was "under arrest for threatening a police officer."

Over a minute after first trying to arrest Henry, the officers secured him and took him, still shouting protests, to Officer White's cruiser. From this point forward, interactions between Henry and the officers are captured on the cruiser's dash camera (as they led him from his property to the cruiser) and internal camera (once Henry was placed in the car). When Henry was first placed in the car, he sat on the rear, driver's-side seat, facing out the open door. He complained of having trouble breathing and seeing, due to the aftereffects of the pepper spray, while continuing to insist that he had done nothing wrong, should not have been arrested, and had not resisted arrest. He asked the police if they had water, but they did not. An officer eventually had to come around through the other door and guide Henry to a seated position, after which the officers shut both doors. The officers remained outside the vehicle and began to take his name and other information, while one checked again to see if the cruiser had water. (It did not.) Henry shouted that he did nothing wrong and began spitting and wheezing to try to clear the pepper spray, as well as writhing back and forth. In the midst of this, and while also intermittently answering questions about his name, date of birth, etc., Henry at one point said, "the thing is cutting into my thing." About a minute later, he said something hard to fully understand ending in "my hand." At around that time,

---

[1] It is unclear from the recording which happened first, but the police officers themselves in their brief state that "[a]t this point Henry had turned, left the sidewalk and was approaching his residence, and Coe exited his police cruiser and approached Henry to arrest him."

he can also be seen on the police cruiser's internal camera working his arms apparently to relieve pressure on his handcuffs. During and after all of this, he was still shouting that he had done nothing wrong and violently wheezing and spitting.

Less than two minutes later, Officer White began driving Henry the 2.8 miles to the police station. Footage from the cruiser's internal camera shows Henry still suffering from the effects of pepper spray: rocking back and forth, sneezing, wheezing, spitting, and generally in significant discomfort. At one point, his rocking back and forth turned into considerably more convulsive movements, and Henry later identified this as a moment at which he had a seizure. During the ride, Henry and Officer White did not converse, though Henry occasionally repeated the phrases "oh God," "I ain't do nothing wrong," and "oh, it burns" and, at the end, said, "oh God, my arms swollen." Having arrived at the station, Officer White and Henry engaged in another interchange over the merits of the arrest, and Henry was then taken inside, where he was uncuffed. Henry was charged with disorderly conduct and resisting arrest. Prosecutors dropped the charges when the officers failed to show up for the court date; the officers maintain they never received the subpoenas to do so.

Henry and his girlfriend, Heather Williams, filed a § 1983 lawsuit against the city and the three officers, alleging unlawful arrest, retaliatory arrest, and excessive force. The court granted summary judgment to the officers. Henry and Williams appeal.

## II. Standard of Review

We review *de novo* the district court's grant of summary judgment. *Wojcik v City of Romulus*, 257 F.3d 600, 608 (6th Cir. 2001). We also review *de novo* the question of whether a defendant is entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010).

Because this is an appeal from a grant of summary judgment, we take questions of fact in the light most favorable to the non-moving party—here the plaintiff, Henry.[2] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On the other hand, qualified immunity provides that if *any* reasonable officer could have thought what the officer was doing did not violate constitutional rights, then the officer gets qualified immunity. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

## III.  Analysis

### A.  The *Brandenburg* Scenario

Qualified immunity is an officer-friendly doctrine, designed to ensure that police, who have to make snap judgments to protect themselves and others in uncertain conditions, will not face undue Monday-morning quarterbacking from courts afterward. Qualified immunity therefore limits success in such suits to only those situations in which no reasonable officer, of all the universe of reasonable officers, would make a given decision. Review of a grant of summary judgment, on the other hand, is extremely friendly to the party that did not move for it, which in qualified immunity cases is often, but not always, the plaintiff, as here. Because juries, not judges, are supposed to be the trier of contested facts, and summary judgment involves a judge disposing of the case before it gets to a jury, summary judgment is reviewed taking all inferences as to facts that can reasonably be disputed in favor of the non-moving party. Only if that party's claim cannot survive even with every factual inference in his or her favor, do we uphold the district court's decision to terminate the lawsuit before it reaches a jury. As one can imagine, the interaction of

---

[2] "Where, as here, there is 'a videotape capturing the events in question,' the court must 'view[ ] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)) (brackets in original). Unfortunately for our purposes, the dispositive factual question was not captured on the recording here. We refer to the cell-phone recording and the police cruisers' dashcam recordings otherwise for the facts contained in them, which are not in dispute.

the standards for qualified immunity and for summary judgment can cause courts considerable difficulties.

In one situation, however, this tangle falls away, yielding a simple question. Consider a stylized hypothetical. A candidate for governor is giving a speech denouncing the incumbent, during which he is arrested by the state police. The police claim that they arrested him because, during the speech, the candidate drew a gun and shot a member of the audience. The candidate sues, stating flatly that no such thing happened and that the police arrested him because of his criticisms of the governor. There is no question that if the politician did in fact shoot someone, the police were justified in arresting him and therefore qualified immunity should shield them from suit. Alternatively, there is no question that if the shooting did not happen, the politician was the victim of an unlawful arrest redressable at law. Absent sufficient proof to resolve on summary judgment whether the shooting did or did not happen, this presents a question of fact for trial. The case, in other words, turns not on the question of qualified immunity, but on a question of fact predicate to the question of qualified immunity.

Such a scenario has occurred in less lurid circumstances in our caselaw. In *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989), there had been a confrontation between an armed man standing on his own property and officers off the property, leading to the officers shooting the man dead. The officers said he was pointing a rifle at them. If that were so, their actions in shooting him were surely justified. The contrary view was that he was simply carrying the rifle pointed at the ground—in which case the officers' actions were not justified. *See id.* at 215. The law was clear, but there was a genuine issue as to the crucial fact. We remanded for the case to proceed, denying qualified immunity. *Id.* at 215–16.

Similar scenarios arose in somewhat different postures in *Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011), and *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007). In *Kennedy*, a police officer appealed the denial of qualified immunity by the district judge. 635 F.3d at 213. A homeowner had become embroiled in a zoning dispute with a local official who was both a building inspector and also a police officer. The homeowner went to the municipal offices and, following a confrontation, the building inspector/police officer arrested him. *Id.* at 212. We concluded that, when viewing the *facts* in the light most favorable to Kennedy—i.e., that the noise had not been unreasonable—then as a matter of *law* no reasonable officer could have had probable cause to arrest him.[3] We therefore upheld the district court's denial of qualified immunity, leaving the factual question for a jury to decide.

In *Leonard*, we ruled that certain antiquated Michigan statutes (forbidding, e.g., blasphemous cursing and swearing) were so obviously unconstitutionally vague or otherwise in violation of the First Amendment that no reasonable officer could have thought they provided probable cause to arrest a business owner who was speaking, somewhat intemperately, at a city meeting. 477 F.3d at 358–60. Given that, we remanded for trial on the disputed issue of material fact as to whether the arresting officer had a proper motive, *i.e.* because the speaker was being genuinely disruptive, or an improper one, namely that there was a business dispute between the speaker's wife and the local police chief. *Id.* at 360–63.

Such cases and their disposition reflect our longstanding rule that "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge,

---

[3] The defendant officer had in that case actually conceded that a dispute of material fact existed and had appealed only on the ground that the law was not clearly established. *Id.* at 214. But we held that insofar as the facts were as Kennedy alleged, the state law and constitutional law in question was clearly established and that no reasonable officer could have thought an arrest was constitutional. *Id.* at 217. ("In a qualified-immunity analysis at the summary-judgment stage, we are constrained to view the facts favorably to" the plaintiff, and that "[o]nce we do so, there is no basis on these facts on which an officer could conclude that he had probable cause to arrest Kennedy.").

must determine liability." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting

*McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir.2010) (internal quotation marks omitted)). The

question thus becomes whether our case fits into this scenario (which we will call the *Brandenburg*

rule) in which qualified immunity either clearly applies or clearly does not, and which it is turns

on a disputed question of fact. If this is such a *Brandenburg* rule case, remand for trial is

appropriate. For while the legal question is clear either way (qualified immunity either would or

would not attach), the factual question predicate to qualified immunity remains unclear. We now

turn to examine whether this is such a case.

B. *Brandenburg* Applied to Henry's Arrest

City of Flint Code of Ordinance § 31-12 sets out the city's "Disorderly Conduct and

Disorderly Persons" misdemeanor:

(a) A person is a disorderly person if the person does any of the following:

\* \* \*

(5) Persists in disturbing the public peace and quiet by loud or aggressive conduct, having once been clearly informed by persons affected that he is in fact unreasonably causing such a disturbance, provided, however, that notice need not be given when such persons affected reasonably believe that to do so would constitute a risk to their personal safety.

Flint City Code of Ordinances, §31-12(a)(5). Henry thus violated the Flint ordinance only if (1) he

was "disturbing the public peace and quiet by loud or aggressive conduct" and (2) he had been

"clearly informed" that he was "unreasonably causing such a disturbance." § 31-12(a)(5). So our

question is: Could any reasonable officer have thought that there was probable cause to believe

that Henry violated the ordinance? If so, the officers in our case get qualified immunity. If not, or

11

if there is genuine issue of fact as to the facts that would underpin the officers' view, then they do not.[4]

Thus, we turn to examine what the facts are. Could a reasonable officer have thought that Henry was causing a disturbance? Could a reasonable officer have thought Henry was warned as required by the ordinance? We hold that there is a genuine issue as to these facts, and so qualified immunity must be denied at this stage.

From the tape, the conversation about the officer's actions near Henry's house took on an increasingly acrimonious tone. Officer Henige's initial response to Henry's inquiry was not of a tone to mollify a concerned homeowner, while Officer Coe's remark that "I think we just got a new project house" was frankly thuggish. For his part, Henry started cursing at the officers early and his language grew more strident even as he resisted attempts to smooth things over. But on the other hand, Henry never left his property, and the officers, at that time, never came on to his property. Indeed, the tape indicates that they knew they could not without his permission or, presumably, probable cause to arrest him. From the tape, both sides were speaking loudly, though, because the recording is from Henry's phone, his voice is, to us, much more distinct.

In any event, Officer Coe argues that a distinct series of facts after this prelude led to the arrest. He relies on his statement that a neighbor's light came on, which he argues was (or could

---

[4] Though the officers' statement while arresting Henry suggested that the officers originally intended to arrest Henry for making threats against them, Henry was charged under the disorderly-person statute. The officers now primarily defend the arrest on the latter ground. *See Devenpeck v Alford*, 543 U.S. 146, 153–54 (2004) (the lawfulness of an arrest rests not on the basis of the officer's subjective understanding at the time of the arrest but on an objective analysis of whether there was a proper basis to make that arrest). It seems clear enough to us in any event that Henry's "promise it's a threat" to let someone find out who he is "downtown" was clearly a suggestion that he would file an administrative complaint or a lawsuit, exercise his political weight (which there is no record indication that he had), or some such, rather than anything a rational police officer would perceive as a physical threat. Given that, moreover, it would raise serious constitutional questions to make such a "threat" to make a complaint "downtown" the basis for the arrest. *Cf. Kennedy v. City of Villa Hills*, 635 F.3d 210, 216 (6th Cir. 2011) ("It is well-settled that the freedom to criticize public officials and expose their wrongdoing is a fundamental First Amendment value . . . .") (quoting *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002)).

have been perceived by a rational officer as) a sign that Henry was causing a disturbance. He also relies on his statement, captured on tape, that "I'm just worried about you bothering the neighbors," as a sufficient warning to meet the "clearly informed" requirement of the Flint ordinance.

Absent the light being turned on as a possible sign of disturbance to others, there was no ground for believing there was a basis for arresting Henry—other than his profanity and verbal abuse of the officers, which we have clearly held is not, standing alone, a basis for an arrest. *See Greene v. Barber*, 310 F.3d 889, 896–97 (6th Cir. 2002); *Kennedy*, 635 F.3d 215–16.

As to the light: Henry argues that no such light came on. Coe's fellow officer, White, says he did not notice any such light. While it is difficult to prove a negative, this testimony is enough to create a genuine issue as to the veracity of Coe's statement, and thus the basis for the arrest.[5]

And the tape alone does not definitively establish whether Henry's end of the conversation sufficiently disturbed the public peace to justify an arrest. We emphasize again that the question is not "did his conduct disturb the public peace?" It is, "could any reasonable officer have believed that there was probable cause to believe that the conduct disturbed the public peace?" This formulation allows the officers ample leeway for immunity in close cases. Here, however, the facts are sufficiently unclear that, taking Henry's side of the facts before us, a reasonable jury could find that no reasonable officer could have thought there was such a disturbance, rather than simply a belligerent, profane, and uncooperative person. We note also that, by the officers' own account, Henry had apparently turned to end the discussion and enter his house when the officers charged onto his property to arrest him.

---

[5] Henry, moreover, has called Coe's credibility into question by noting that, at his deposition, Coe admitted to four false statements in his contemporaneous police report, including a statement that, before the light came on, he had asked Henry to go back inside and Henry had refused. Coe agreed that each of these four statements helped paint his use of force against Henry as more justified than it otherwise would have been.

As to the purported warning, Officer Coe said that he was "just worried about you bothering the neighbors" just after Henry had asked the officers (admittedly, rudely and sarcastically) to name "a crime [he had] committed," which garnered no response aside from "C'mon… c'mon," and several exchanges before the actual arrest took place. In the context of the conversation to that point, with a statement that had no connection to a law or a possibility of arrest, there is a genuine issue as to whether a reasonable officer could consider that this was a legally sufficient warning under the ordinance.

Thus, just as in *Brandenburg*, this case is one in which summary judgment was not appropriate. Although we again emphasize that our ruling is not a judgment on the ultimate state of facts, only that questions of fact remain, nevertheless the officers are not, at this stage, entitled to qualified immunity. We therefore reverse on this point.[6]

## C.  Henry's Other Claims

Since we reverse the grant of summary judgment as to Henry's claim of unlawful arrest, we must address the post-arrest events, in the event that the arrest is ultimately held to be valid. If the arrest *was* valid, then the force used in pepper spraying, detaining, and transporting to the police station, are unquestionably reasonable, even on plaintiff's version of the facts and clearly established law. *If* the police did have good reason to take Henry into custody, then the use of pepper spray to induce compliance in a suspect who was trying to get away from the arresting

---

[6] Henry also brings a claim for retaliatory arrest, alleging that his arrest in fact was unlawful retaliation for his First-Amendment-protected statement that he would file a complaint against the police. ("You gonna run up and find out who I am downtown and stuff.") The district court held that "[b]ecause the Officers had probable cause to arrest Henry for disorderly conduct, there was no violation of his First Amendment rights" and also that qualified immunity attached, citing *Reichle v. Howards*, 566 U.S. 658, 665 (2012). *Reichle* held that qualified immunity attaches in the case of a retaliatory arrest that is otherwise supported by probable cause, because the right to be free from such arrest had not clearly been established. The Supreme Court has now clarified that where there is legitimate probable cause for an arrest, a "retaliatory arrest claim fails as a matter of law." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1728 (2019). Having reversed the grant of summary judgment as to whether the officers had probable cause, we also reverse the court's judgment as to the First Amendment retaliation claim and remand for further proceedings as to this cause of action.

officers was not clearly excessive. *See Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 521 (6th Cir. 2008). Thus, the excessive-force claim can only go forward to the extent that the underlying false-arrest claim remains viable.

Henry's handcuffing claim is a closer call. We have clearly established law that "[t]he Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). This rule is governed by a three-part test:

> In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some 'physical injury' resulting from the handcuffing.

*Ibid.* We find it close, but conclude that Henry did not clearly complain that the handcuffs were too tight. His clearest statement to this effect was "the thing is cutting into my thing." He later says something hard to fully understand ending in "my hand." We, watching from the cruiser's interior camera and with the benefit of hindsight, can see that he is struggling against the handcuffs as he says this. But the officers were not similarly situated. They were outside the car and trying to balance several different problems at once: Henry was clearly suffering from the effects of pepper spray, and they had been unsuccessful in finding water with which to help him; he was protesting his detention and generally was quite upset; and they were at this time trying to take his vital information down. It is unclear if they understood or even heard his complaints, and it seems clear that they did not see the visual cues of his discomfort in the same way we did. Moreover, as we have noted:

> [A] constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are "too tight" is neither reasonable nor clearly established. Here, the short duration of the trip, adherence to police handcuff protocol, and absence of any egregious, abusive, or malicious conduct supports the reasonableness of the officers' conduct.

15

> Moreover, unlike other cases in which we have denied qualified immunity, the officers here acted without malice and with reason—they declined to loosen the handcuffs in light of the short, ten-minute transport to the police station. *Cf. Morrison*, 583 F.3d at 402–03; *Baskin v. Smith*, 50 F. App'x 731, 737–38 (6th Cir. 2002); *Kostrzewa v. Troy*, 247 F.3d 633, 640 (6th Cir. 2001); *Martin* [*v. Heideman*], 106 F.3d [1308,] 1310 [6th Cir. 1997)].

*Fettes v. Hendershot*, 375 F. App'x 528, 533–34 (6th Cir. 2010). Under our circumstances, in which Henry's complaints were indistinct, the need to get him some water was pressing, the station was near, and the officers had a very upset arrestee, qualified immunity at the very least attaches to the officers as regards the handcuffing claim. Thus, the handcuffing claim cannot survive independently, though if the arrest is found unlawful, the handcuffing may form part of the damages as regards the arrest.[7]

## CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court entering summary judgment for the defendants and REMAND for further proceedings not inconsistent with this opinion.

---

[7] Henry and Williams make two other claims. The first is that Henry suffered a seizure while handcuffed in the car and that the police denied him medical attention. But Henry said nothing to this effect at the time, and the video evidence shows behavior that was consistent with a man suffering the after-effects of pepper spray. To maintain a cause of action for failure to provide adequate medical care, we have required the plaintiff to show that, inter alia, "the officer has notice of the detainee's medical needs." *Esch v. County of Kent*, 699 F. App'x 509, 515 (6th Cir. 2017). This claim therefore must fail.

The other claim is brought by Williams, who was sprayed by some of the pepper spray while the police were arresting Henry. Williams cites no case for the proposition that a bystander who is incidentally hit with pepper spray in the course of an arrest can maintain a cause of action. This claim therefore cannot be maintained either.

SUTTON, Circuit Judge, concurring. David Henry and the officers who arrested him cannot be credited with civility or making wise decisions when this encounter occurred at 1:30 a.m. Each of them probably would handle the situation differently if given another chance. But Article III does not empower us to turn back the clock. That requires us to decide whether Henry's false arrest claim survives summary judgment. That's a close call. I accept the court's judgment that Henry deserves a trial on the point. But I would reach that conclusion based only on the Flint Ordinance's notice requirement. The officers have not adequately explained at this stage of the case how Henry was "clearly informed by persons affected" to quiet down. Flint, MI, Code of Ordinances § 33-12. Whether "persons affected [could have] reasonably believe[d]" that talking to Henry "would constitute a risk to their personal safety" ultimately turns on a dispute of fact suited for a jury. *Id.* I would leave it at that.